**In re The LESLIE FAY COMPANIES, INC., et al., Debtors.**

**Bankruptcy No. 93–B–41724(TLB).**

United States Bankruptcy Court, S.D. New York.

Dec. 15, 1994.

As Amended Dec. 16, 1994.

U.S. Trustee for S.D.N.Y. by Arthur J. Gonzalez and Norma Ortiz, New York City.

Weil Gotshal & Manges by Harvey Miller and Alan B. Miller, New York City, for debtors and appearing pro se.

Wachtell, Lipton, Rosen & Katz by Chaim Fortgang, New York City, for Official Committee of Unsecured Creditors.

Lord, Bissell & Brook by Benjamin Waisbren, Chicago, IL, for Official Committee of Equity Security Holders.

DECISION ON UNITED STATES TRUSTEE'S MOTION TO DISQUALIFY WEIL, GOTSHAL & MANGES AS DEBTORS' COUNSEL AND TO IMPOSE AN ECONOMIC SANCTION AGAINST WEIL, GOTSHAL & MANGES

TINA L. BROZMAN, Bankruptcy Judge.

Rarely am I faced with a motion as troubling as this one, the United States Trustee's motion to disqualify Weil, Gotshal & Manges ("Weil Gotshal"), the debtors' counsel, from further representation of its clients and to deny the firm fees because of its failure to disclose what the United States Trustee ("U.S. Trustee") dubs disabling conflicts. The motion is predicated upon the report of an examiner who had concluded that Weil Gotshal was not disinterested when retained and had failed to reveal to the court the connections which led to his conclusion. I am in accord with the examiner's assessment, although I do not share his view that the appropriate sanction is limited to imposition on Weil Gotshal of a portion of the costs which he incurred investigating Weil Gotshal's status. Indeed, it is the nature of the sanction which is the troubling element here for, as the examiner found, Weil Gotshal has

rendered services competently and loyally to the debtors, notwithstanding its derelictions in the area of disclosure, and the debtors undoubtedly will be harmed by Weil Gotshal's complete removal from the case some twenty months into the reorganization effort. This fear of harm to the debtors is shared by both official committees as well as the examiner.

## I.

### A. *Background* [1]

The Leslie Fay Companies, Inc. ("Leslie Fay") is a large, publicly-owned corporation primarily engaged in designing, manufacturing, and selling women's dresses, suits, and sportswear. It is one of the few large American clothing manufacturers which still manufactures in the United States.

On January 29, 1993, Leslie Fay's controller, Donald Kenia, disclosed to senior management that he had been making unsupported entries into Leslie Fay's general ledger, resulting in a significant misstatement of its financial standing. Two days later, senior management informed Leslie Fay's board of directors (the "Board" or "Board of Directors") which in turn disclosed the existence of the false entries to the general public.

The Board directed its audit committee (the "Audit Committee") to conduct an investigation into the facts and circumstances surrounding the accounting irregularities. At the time, the Audit Committee was composed of three independent, non-management directors: Ira J. Hechler, a private investor; Ralph Destino, Chairman of Cartier, Inc.; and Michael L. Tarnopol, a senior officer at Bear Stearns & Co. ("Bear Stearns"). The Board then appointed Steven Friedman, the only other outside director of Leslie Fay, to join Hechler, Destino, and Tarnopol on the Audit Committee and in their investigation of the accounting irregularities. Friedman is a senior manager of Odyssey Partners L.P. ("Odyssey"), a large partnership that acts principally as a merchant bank.

Included in the Audit Committee's charter were the identification of all parties who may have been involved in the accounting irregularities and the consideration of possible legal claims that could be asserted on behalf of Leslie Fay. Toward those ends, the Audit Committee retained the accounting firm of Arthur Anderson & Co. and Weil Gotshal. Prior to its retention by the Audit Committee, Weil Gotshal had not done any work for Leslie Fay, whose general outside counsel was the law firm of Parker, Chapin, Flattau & Klimpl ("Parker Chapin").

In late February, 1993, the Audit Committee issued preliminary results of its work, announcing that Leslie Fay's 1991 profits had been overstated by over $12 million. Accordingly, the accounting firm of BDO Seidman ("Seidman"), Leslie Fay's independent auditors, officially withdrew its signature from Leslie Fay's 1991 financial statements. The Audit Committee had also learned by this point that Kenia's initial representation that he alone was responsible for the false entries was not true. As was later confirmed, the fraud reached to Leslie Fay's chief financial officer, Paul Polishan.

### B. *Weil Gotshal's Court–Approved Retention and the Subsequent Questions*

The consequences of this burgeoning scandal were calamitous to Leslie Fay. Lenders and suppliers froze its credit lines, and Leslie Fay was unable to secure the financing necessary for the continued operation of its business. This led to an expansion of Weil Gotshal's role to include advice on financial restructuring. On April 5, 1993, nine weeks into the Audit Committee's investigation, Weil Gotshal filed chapter 11 petitions on behalf of Leslie Fay and its affiliates (the group referred to for convenience as "Leslie Fay"). The same day, Weil Gotshal submitted an application for retention as counsel for the debtors in possession, which was approved by the Hon. Cornelius Blackshear of this court. The order contemplated that Weil Gotshal would continue in its work for the Audit Committee as part and parcel of its

---

1. The parties do not dispute the facts, most of which are drawn from the examiner's report or the court's own file.

representation of the debtors. The U.S. Trustee, the only party in interest to receive notice, had indicated that he did not object to the retention.

By late September, the Audit Committee completed its investigation, and on September 27, 1993, it disclosed its findings to the Board of Directors. The Audit Committee concluded that there was no evidence that any member of the debtors' current[2] senior management or the Board of Directors knew of or participated in the fraudulent entries, which it estimated totalled some $160 million. The Audit Committee also discovered, contrary to what was originally believed, that the accounting irregularities dated back to at least 1990. These findings were made public on September 29, 1993.

At just about this time, questions regarding Weil Gotshal's disinterestedness were raised by the official committee of unsecured creditors (the "Creditors' Committee"). A hearing on first interim fee applications had been set for November 4, 1993. Both the Creditors' Committee and the U.S. Trustee filed objections to Weil Gotshal's request for fees on the grounds that Weil Gotshal was not disinterested as required by 11 U.S.C. § 327(a)[3] (title 11 of the United States Code hereafter referred to as the "Code") and had failed to file a full and complete disclosure as required by Fed.R.Bankr.P. 2014.[4]

Weil Gotshal responded to the objections by asserting that it had met the Code's disinterestedness requirement and had fully satisfied its disclosure obligations in its retention affidavit. In addition, Weil Gotshal submitted a supplemental affidavit containing information regarding certain of its previously-undisclosed relationships that had been questioned by the Creditors' Committee.

C. *Appointment of the Examiner*

On December 2, 1993, in response to the cloud hovering over Weil Gotshal's representation of the debtors, Leslie Fay moved for the appointment of an examiner to look into Weil Gotshal's disclosure and disinterestedness and the veracity of the Audit Committee's report in light of those issues. The Creditors' Committee agreed that I should appoint an examiner, but asked that the scope of the examiner's retention be expanded beyond that proposed by Leslie Fay. On December 16, 1993, I ordered the appointment of an examiner who would be charged with two tasks, the first of which was

undertak[ing] such investigation and analyses as are necessary to formulate a recommendation to the Court as to whether the law firm of Weil, Gotshal & Manges, in its capacity as attorneys for the Debtors in Possession herein, under the circumstances of these chapter 11 cases and in accordance with section 327 of the Bankruptcy Code and Rule 2014 of the Federal Rules of Bankruptcy Procedure, is disinterested or holds or represents an interest adverse to the Debtors' estates or made adequate disclosure.

The second task assigned to the examiner was to evaluate whether (i) there were any viable claims that could be asserted against any other parties in connection with the accounting irregularities that could increase the size of the chapter 11 estate and; (ii) whether the Audit Committee's work in that regard had been acceptable or if further investigating was necessary. I approved the appointment of Charles A. Stillman as examiner on January 18, 1994. Over the next six months, the examiner conducted a thorough

---

**2.** By this time, Polishan was no longer Leslie Fay's chief financial officer.

**3.** Section 327(a) provides:

Except as otherwise provided in this section, the trustee, with the court's approval, may employ one or more attorneys ... that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties under this title.

The requirements of the section apply equally to a debtor in possession by virtue of section 1107

of the Code. *See* 2 L.King, *Collier on Bankruptcy,* ¶ 327.01 at n. 1a (15th ed. 1994).

**4.** Rule 2014 deals with applications for professional employment in bankruptcy cases and requires "a verified statement of the person to be employed setting forth the person's connections with the debtor, creditors, or any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee."

investigation into Weil Gotshal's alleged conflicts and into the Audit Committee's investigation of the accounting irregularities.

### D. *What the Examiner Found*

#### 1. *The Audit Committee Membership*

The disclosure of the accounting irregularities in early 1993 prompted a flurry of litigation. Weil Gotshal represented the Audit Committee members with respect to some of these matters. Class actions were filed charging certain officers and directors, including members of the Audit Committee, with securities fraud (the "Securities Fraud Litigation"), on the grounds that, as members of the Audit Committee, they knew or should have known of the irregularities, and that the irregularities caused a precipitous drop in the price of Leslie Fay stock. Weil Gotshal represented the Audit Committee in these actions, negotiating an agreement to drop the members' names from the litigation, subject to certain conditions. In addition, a shareholder's derivative suit was commenced in state court (the "Derivative Suit"), charging the Audit Committee with essentially the same impropriety that the Securities Fraud Litigation alleged. Weil Gotshal accepted service of process on behalf of the Audit Committee members, but had done nothing more with regard to this lawsuit prior to Weil Gotshal's retention in the chapter 11 cases.[5]

#### 2. *Weil Gotshal's Relationships With the Potential Targets of Its Investigation*

Whereas prior to Weil Gotshal's retention by the Audit Committee it had never represented Leslie Fay, it did maintain professional and personal relationships with parties that had an interest in the outcome of the Audit Committee investigation. Yet none of these relationships was disclosed to the court.

##### (a) *Tarnopol/Bear Stearns*

Michael L. Tarnopol is a director of Leslie Fay and was a member of the Audit Committee throughout the period when the accounting irregularities were taking place. He is also a senior officer at Bear Stearns. Bear Stearns, a large investment bank, is a valuable client of Weil Gotshal, and was so at the time of Weil Gotshal's retention by Leslie Fay. Weil Gotshal admitted to the examiner that it would not initiate a lawsuit against Bear Stearns on behalf of another client without Bear Stearns' consent.

Bear Stearns was the lead underwriter in a secondary public offering of 2.1 million shares of Leslie Fay stock, then valued at approximately $40 million (the "Stock Sale") in June, 1991, well after the accounting irregularities began.

The examiner concluded that Tarnopol was a potential target of the Audit Committee's investigation.

##### (b) *Friedman/Odyssey*

Steven Friedman is a director of Leslie Fay who was appointed to the Audit Committee when the accounting irregularities came to light. At the time of Weil Gotshal's retention, he was also a general partner of Odyssey. Odyssey is another longstanding client of Weil Gotshal, one against whom Weil Gotshal also would not initiate suit absent the client's consent. Additionally, Odyssey and Friedman were the owners of the 2.1 million shares that were the subject of the Stock Sale.

Weil Gotshal also represented Friedman personally, providing him with estate planning services in 1988 and 1989. It has done the same for other Odyssey partners. Moreover, two other Odyssey partners had served on Leslie Fay's Board of Directors during the period of the accounting irregularities.

The examiner found that Friedman, like Tarnopol, was a potential target of the Audit Committee's investigation.

##### (c) *BDO Seidman*

Seidman was Leslie Fay's independent auditor during the period of the accounting irregularities. It was Seidman that had certified Leslie Fay's false financial statements.

---

5. The Justice Department got into the act as well, commencing an investigation into the accounting fraud at Leslie Fay. The Audit Committee assured the United States Attorney of its intent to fully cooperate with the investigation. Typically, Weil Gotshal was responsible for responding to information requests by the U.S. Attorney on behalf of the Audit Committee.

That Seidman was a natural target of the Audit Committee's investigation is obvious. Not surprisingly, Seidman was a party to both the Securities Fraud Litigation and the Derivative Suit. Seidman is also a Weil Gotshal client, albeit on a much smaller scale than Bear Stearns or Odyssey. Weil Gotshal has represented Seidman in two matters. One matter involved the nonpublic investigation of a former Seidman client by a federal regulatory agency. Weil Gotshal assisted Seidman in furnishing documents requested by that agency. That matter was inactive at the time of Weil Gotshal's retention by Leslie Fay. Weil Gotshal also represented Seidman in a malpractice lawsuit commenced against Seidman in June, 1992. As of the date of Weil Gotshal's retention by court order, the case was still active, although the amount of fees involved in that case was relatively small.

### 3. *Weil Gotshal's Undisclosed Representation of Leslie Fay's Seventh Largest Creditor*

At the time of Weil Gotshal's retention, Forstmann & Co. ("Forstmann") was Leslie Fay's seventh largest creditor, with a claim of approximately $700,000. It subsequently sold its claim and resigned from the Creditors' Committee. Weil Gotshal was general outside counsel to Forstmann through 1991 and since then has served Forstmann in a more limited role, nonetheless continuing to represent Forstmann on a variety of matters.

### E. *The Extent of Weil Gotshal's Disclosure*

In connection with Weil Gotshal's retention application of April 5, 1993, Alan B. Miller, a partner of the firm, submitted an affidavit of retention to the court in which he professed that, to the best of his knowledge, Weil Gotshal did not "hold[ ] or represent[ ] any interest adverse to the debtors or their estates in the matters upon which [Weil Gotshal] was to be employed." The affidavit disclosed that Weil Gotshal had been working for the Audit Committee, had counseled Leslie Fay with regard to its efforts to restruc-

ture its debt, and had assisted it in the filing of the chapter 11 petitions. The affidavit also disclosed generally that Weil Gotshal represented entities that were "claimants of the Debtors in matters totally unrelated to the Debtors' cases." Some examples of those claimants were listed, although Forstmann was not one of them. (Even after the Creditors' Committee was formed and Forstmann was made a member, Weil Gotshal did not disclose its representation of Forstmann.) In addition, the affidavit contained the boilerplate statement that Weil Gotshal was involved in numerous unrelated matters with attorneys and accountants that represented parties-in-interest in the chapter 11 cases, but that none of those relationships was adverse to Leslie Fay.

Weil Gotshal did not disclose, however, that it had professional relationships with individual Audit Committee members. It did not disclose that it represented Bear Stearns and Odyssey, and that those companies were connected to Friedman and Tarnopol, respectively. It did not disclose Bear Stearns' and Odyssey's relationship to the Stock Sale. Similarly, Weil Gotshal did not disclose its relationship with Seidman, despite the fact that, even at the time, Weil Gotshal recognized that Leslie Fay might have claims against Seidman.

### F. *The Examiner's Conclusions*

The examiner concluded that "Weil Gotshal was not disinterested in the matter, and did not make proper disclosure, as mandated by the Bankruptcy Code and related provisions." (Ex. Report at 3). Specifically, he found that Weil Gotshal had failed to disclose its relationship to two of the members of the Audit Committee and the firms of which they were partners, to Seidman and to one of the debtors' largest unsecured creditors. And he concluded that these undisclosed relationships, if known, would have cast substantial doubt on whether Weil Gotshal could conduct a fair and impartial investigation for the Audit Committee.[6] However, he also found that "[t]he conflict presented [was] principally one of perception: under all the circumstances,

---

6. However, he did not believe that the Forstmann connection presented a conflict. I concur

in that view, but believe that it should have been disclosed nonetheless pursuant to Rule 2014.

there [was] a fair perception that because of multiple representations and client relationships, Weil Gotshal would be unable to act solely in the debtors' best interests." (Ex. Report at 3). According to the examiner, Weil Gotshal caused the debtors no actual injury, and represented them in an exemplary fashion. Thus, he concluded, the appropriate sanction would be the disallowance out of future fees of some of the cost of his investigation into Weil Gotshal's disinterestedness and disclosure, but he recommended that "disqualifying Weil Gotshal, or imposing a sanction beyond such limited allowance of fees, [was] not warranted." *Id.*

## II.

The U.S. Trustee took a different view of things and on October 19, 1994, moved to disqualify Weil Gotshal from serving as counsel to the debtor in possession and for the imposition of economic sanctions. The U.S. Trustee bases his motion upon the findings of the examiner, disagreeing, however, with his conclusion that no actual harm accrued to Leslie Fay. Although the U.S. Trustee does not question the examiner's opinion that Weil Gotshal vigorously represented Leslie Fay, he believes that Weil Gotshal's asserted lack of disinterestedness called the integrity of the Audit Committee's investigation into question, regardless of how thoroughly the investigation was actually performed. According to the U.S. Trustee, "when the credibility of an action by the Debtors' counsel is an integral element of the very task to be performed—as it was in this case—any 'conflict' which exists in performing that function causes actual harm." (U.S. Trustee Mot. to Disqualify at 20).

In response to the U.S. Trustee's motion, Weil Gotshal vigorously denies that it ever had any conflict of interest or that it did not meet its disclosure obligations. In Weil Gotshal's view, "the U.S. Trustee's allegations are simply wrong as a matter of fact and law." (Weil Gotshal Memorandum of Law at 2). Trying to turn the defense of its actions into an attack on the motives of those

who have raised any question, Weil Gotshal has labeled the initial Creditors' Committee challenge as a pressure tactic and the U.S. Trustee's motion as a vindictive action prompted by certain newspaper articles which must have been unsettling to the Trustee. This is somewhat startling given the existence of a report by an independent examiner which concluded that there was substance to the concerns first voiced by the Creditors' Committee.

Perhaps ironically, the Creditors' Committee now opposes the U.S. Trustee's motion, at least to the extent that it seeks to disqualify Weil Gotshal.[7] As mentioned earlier, the Creditors' Committee fears grave harm to Leslie Fay, and, by extension, its creditors, stockholders and employees, should Weil Gotshal be disqualified. The Committee's preferred remedy is an economic sanction. The Official Committee of Equity Security Holders (the "Equity Committee") essentially concurs with the Creditors' Committee, admitting that disclosure was not complete but recommending that disqualification is unwarranted.

## III.

There are two grounds upon which the U.S. Trustee bases his motion, first, that Weil Gotshal did not make the complete disclosure mandated by Fed.R.Bankr.P. 2014 and second, that Weil Gotshal was in fact not disinterested at the time of its retention in the chapter 11 cases, in violation of section 327(a) of the Code. The legal standards governing each theory are distinct and deserve separate attention. The facts to which the law must be applied will follow the discussion of the legal standards.

### A. *Legal Standards Governing Retention*

■ Section 327(a) of the Code, quoted earlier in this decision, seemingly imposes two requirements on a trustee or debtor in possession seeking to employ counsel: (i) that the attorney does not hold or represent an interest adverse to the estate and (ii) that the attorney is disinterested. The word "dis-

---

7. Since the time that the Creditors' Committee first challenged Weil Gotshal's entitlement to fees, the membership of that committee has al-most completely changed. Also changed is the identity of its counsel.

interested" is a term of art, defined in section 101(14) of the Code as, among other things, not having "an *interest materially adverse* to the interest of the estate ..." (emphasis added). It is from this immediately apparent that the statutory definition of "disinterested" includes the first prong of the requirements for retention under section 327(a) (although the definition of "disinterested" includes the concept of materiality which is not mentioned in section 327). Thus, the First Circuit has noted that "the twin requirements of disinterestedness and lack of adversity telescope into a single hallmark." *In re Martin,* 817 F.2d 175, 181 (1st Cir.1987); *see also In re BH & P, Inc.,* 949 F.2d 1300, 1314 (3d Cir.1991).

The requirements of section 327 cannot be taken lightly, for they "serve the important policy of ensuring that all professionals appointed pursuant to [the section] tender undivided loyalty and provide untainted advice and assistance in furtherance of their fiduciary responsibilities." *Rome v. Braunstein,* 19 F.3d 54, 58 (1st Cir.1994). "Once counsel is employed, 'a lawyer owes his allegiance to the entity and not to the stockholder, director, officer, employee, representative or other person connected with the entity.'" *In re Grabill Corp.,* 113 B.R. 966, 970 (Bankr. N.D.Ill.1990) *quoting In re King Resources Co.,* 20 B.R. 191, 200 (D.Col.1982). Concern with the proper attention to fiduciary obligation has prompted a major treatise on bankruptcy to observe that section 327's standards "are to be rigidly applied." 2 L. King, *Collier on Bankruptcy,* ¶ 327.03 (15th ed. 1994).

The Code does not attempt to define what constitutes an adverse interest. However, interests are not considered "adverse" merely because it is possible to conceive a set of circumstances under which they might clash. *See TWI International, Inc. v. Vanguard Oil and Service Co.,* 162 B.R. 672, 675 (S.D.N.Y. 1994) (conflicts that are "hypothetical or theoretical" not a basis for disqualification); *In re Kelton Motors, Inc.,* 109 B.R. 641, 650 (Bankr.D.Vt.1989). The more difficult area is when a live conflict of interest has not quite emerged, yet the factual scenario is sufficiently susceptible to that possibility so as to make the conflict more than merely "hypothetical or theoretical." The courts have been far from uniform in the way they have formulated tests for dealing with this type of situation.

A handful of courts has held or implied that only "actual," and not "potential," conflicts of interest are disabling. *See In re Stamford Color Photo, Inc.,* 98 B.R. 135, 137–38 (Bankr.D.Conn.1989); *H & K Developers, Inc. v. Waterfall Village of Atlanta, Ltd. (In re Waterfall Village of Atlanta, Inc.),* 103 B.R. 340, 344 (Bankr.N.D.Ga.1989); *see also,* Comment, *Bankruptcy Code Section 327(a) and Potential Conflicts of Interest—Always or Never Disqualifying?,* 29 Hous.L.Rev. 433 (1992). A greater number of courts, including some in this district, have concluded that even "potential" conflicts of interest are disabling. *See In re Codesco, Inc.,* 18 B.R. 997, 999 (Bankr.S.D.N.Y.1982) ("There should be no *opportunity* for the exercise of conflicting interests...." [emphasis added]); *In re Proof of the Pudding, Inc.,* 3 B.R. 645, 647 (Bankr.S.D.N.Y.1980); *see also Bohack Corp. v. Gulf & Western Industries, Inc. (In re Bohack),* 607 F.2d 258, 263 (2d Cir.1979). Yet other courts have been critical of the very distinction between actual and potential conflicts. *See, e.g., In re Kendavis Industries, Inc.,* 91 B.R. 742, 744, 755–56 (Bankr. N.D.Tex.1988). Recently, in *TWI International,* decided in the Southern District of New York, 162 B.R. at 675, the district court stated that "'disqualification should be mandated when an actual, as opposed to hypothetical or theoretical, conflict is present. This in no way precludes disqualification for a potential conflict. The test is merely one of a *potential actual* conflict.'" *Id., quoting In re Wm. J. O'Connor,* 52 B.R. 892, 897 (Bankr.W.D.Okl.1985).

■ The debate over this issue may be more semantic than substantive, for a close review of the cited cases indicates that the results were largely driven by the facts of each case. And indeed, in the context of section 327, that is precisely the way it should be. *See Iannotti v. Manufacturers Hanover Trust Co. (In re New York, New Haven & Hartford Railroad Co.),* 567 F.2d 166, 175 (2d Cir.1977) (no "mandatory re-

quirement that reorganization courts woodenly must deny compensation in every case of conflict of interest, regardless of the facts."); *Interwest Business Equipment, Ltd. v. United States Trustee (In re Interwest Business Equipment, Ltd.),* 23 F.3d 311, 315 (10th Cir.1994) (citing several cases for proposition that bankruptcy court has broad discretion in disqualification cases); *In re Garza,* 1994 WL 282570 *2 (Bankr.E.D.Va. Jan. 19, 1994) ("[C]ourts have generally declined to formulate bright-line rules concerning the criteria for disqualification, favoring instead an approach which evaluates the facts and circumstances of each particular case.").· Potential conflicts, no less than actual ones, can provide motives for attorneys to act in ways contrary to the best interests of their clients. Rather than worry about the potential/actual dichotomy it is more productive to ask whether a professional has "either a meaningful incentive to act contrary to the best interests of the estate and its sundry creditors—an incentive sufficient to place those parties at more than acceptable risk—or the reasonable perception of one." *In re Martin,* 817 F.2d at 180–81. In other words, if it is plausible that the representation of another interest may cause the debtor's attorneys to act any differently than they would without that other representation, then they have a conflict and an interest adverse to the estate.

### B. *Legal Standards Governing Disclosure*

■ Fed.R.Bankr.P. 2014 requires that a professional seeking employment in a bankruptcy case submit a "verified statement … setting forth the person's connections" to the debtor, creditors and any other party in interest. The purpose of Rule 2014, as expressed by the *Collier* treatise,

> is to provide the court (and the United States Trustee) with information necessary to determine whether the professional's employment meets the broad test of being in the best interest of the estate. To that end, a failure to disclose any fact which may influence the court's decision may result in a later determination that disclosure was inadequate and sanctions should be imposed on the professional. The fact that disclosure was made elsewhere (e.g. in the debtor's schedules) is not likely to ameliorate a court's reaction to incomplete disclosure.

8 L. King, *Collier on Bankruptcy,* ¶ 2014.03 (15th ed. 1994). Rule 2014 disclosure requirements are to be strictly construed. *Id.; Rome v. Braunstein,* 19 F.3d at 59; *In re Arlan's Dep't Stores, Inc.,* 615 F.2d 925, 933 (2d Cir.1979) (decided under substantially similar predecessor to Rule 2014.). All facts that may have any bearing on the disinterestedness of a professional must be disclosed. Consistent with the duty placed on the professional, it is the responsibility of the professional, not of the court, to make sure that all relevant connections have been brought to light. *See, e.g., Rome v. Braunstein,* 19 F.3d at 58–60; *In re Glenn Electric Sales,* 99 B.R. 596, 599 (D.N.J.1988); *Diamond Lumber, Inc. v. Unsecured Creditors' Committee (In re Diamond Lumber, Inc.),* 88 B.R. 773, 776 (N.D.Tex.1988). So important is the duty of disclosure that the failure to disclose relevant connections is an independent basis for the disallowance of fees or even disqualification. *See Futuronics Corp. v. Arutt, Nachamie & Benjamin (In re Futuronics Corp.),* 655 F.2d 463, 469 (2d Cir.1981); *In re Arlan's,* 615 F.2d at 933; *Rome v. Braunstein,* 19 F.3d at 59; *In re Granite Sheet Metal Works, Inc.,* 159 B.R. 840, 847 (Bankr.S.D.Ill.1993); *In re Envirodyne Industries, Inc.,* 150 B.R. 1008, 1021 (Bankr.N.D.Ill.1993).

### C. *The Application of the Law to the Facts*

#### 1. *Weil Gotshal Represented Interests that were Materially Adverse to the Debtors at the Time of its Retention*

■ Leslie Fay's bankruptcy, while certainly not unique, was at least unusual in that it was a direct consequence of fraud that had been perpetrated against the company, its shareholders, and its creditors. When the petitions were filed on April 5, 1993, the Audit Committee was far from completing the investigation it had undertaken; thus there was no way to be sure of the extent of the irregularities, or whether others besides Kenia and Polishan may have been involved. The Justice Department had already begun a

criminal investigation into the fraud, and private party civil suits had also been commenced naming, among others, Leslie Fay's directors and its accountants. Because Weil Gotshal was requesting retention not only as Leslie Fay's general bankruptcy counsel but also to complete an investigation into a fraud which may have reached into senior management or even the board of directors, it was especially important that the court ensure that counsel was completely disinterested. Thus, it was incumbent upon Weil Gotshal to be particularly thorough in its retention affidavit. Unfortunately, Weil Gotshal failed to give the court the ability to consider whether the firm had disabling conflicts. At the time of its retention, Weil Gotshal had significant ties to three potential targets of investigation, and yet told neither the court nor the U.S. Trustee.

Weil Gotshal's connections to Tarnopol and Friedman were not insignificant, as Weil Gotshal would have this court find. Both held positions in the highest tiers of Bear Stearns and Odyssey, respectively, which were large and valuable clients of Weil Gotshal. Thus, Weil Gotshal had a perceptible economic incentive not to pursue the possibility of claims against Tarnopol and Friedman with the same vigor and intensity it might have otherwise applied.

Weil Gotshal does not deny that it would not have been disinterested had there been viable claims against Tarnopol and Friedman, but rather contends that by the time it had been retained on April 5, it was clear that no such claims existed. This is said to be so for a number of reasons. First, the Audit Committee was already nine weeks into its investigation, and no evidence had turned up to implicate the Audit Committee or the Board of Directors. Second, according to Weil Gotshal, the scope of liability for outside directors under Delaware law is so narrow that any claims against them were "speculative and hypothetical." I disagree on both counts.

Weil Gotshal relies heavily on the fact that,

[d]uring the interviews conducted prior to the commencement of chapter 11 proceedings, Mr. Kenia admitted that the adjustments to Leslie Fay's financial records were made at his direction. He also stated that the adjustments were made without the knowledge or participation of the independent auditors or the Board of Directors.

(Weil Gotshal Memo. of Law in Opposition to U.S. Trustee's Motion at 34). It is amazing that Weil Gotshal would give so much weight to the "admission" of a man who had committed wholesale fraud upon the company whose finances it was his job to protect, and who had already lied at least once by denying Polishan's involvement in the fraud. As it so happens, it was later discovered "that the adjustments had taken place over a longer time than previously asserted by Mr. Kenia," (Weil Gotshal Memo. of Law at 14) further confirmation that Kenia was not to be taken at his word.[8] Moreover, I am unpersuaded that Weil Gotshal could have been certain of the outcome of the Audit Committee's investigation in April, when that investigation would not be completed until September. By its own admission, Weil Gotshal did not realize the full scope of the accounting irregularities until the middle of May. *Id.* In light of all this, Weil Gotshal's claim that it knew at the time of its court-approved retention that the outside directors could not have been liable rings hollow.

It is true that the outside directors had significant protections under Delaware law, *see generally,* Donald E. Pease, *Outside Directors: Their Importance to the Corporation and Protection from Liability,* 12 Del. J.Corp.L. 25 (1987), but that is a far cry from saying that they could under no circumstances have been found liable. For example, because the investigation was not nearly completed as of the petition date, it is was impossible to say for certain that the directors had not been "reckless," which, as the examiner pointed out and Weil Gotshal did not deny, might provide a basis of liability under Delaware law. *See, e.g., Bell Atlantic Corp. v. Bolger,* 2 F.3d 1304, 1312 (3d

---

8. This means, too, that Weil Gotshal could not and did not know when it was retained by court order whether Leslie Fay might have any claims against Bear Stearns, Odyssey and Friedman arising out of the Stock Sale, another area in which Weil Gotshal had entanglements.

Cir.1993); *Solash v. Telex Corp.*, 1988 WL 3587, *8 (Del.Ch. Jan. 19, 1988). Apparently, the outside directors thought enough of their potential liability to file indemnification claims against Leslie Fay in this court. At any rate, I do not deny that Weil Gotshal may have had an honest belief in the likely immunity of Leslie Fay's outside directors. "The point, however, is that such a determination must be made by the counsel who is in a position to make an independent judgment." *Bohack*, 607 F.2d at 263. And here, the attorneys with the entanglements were the ones who were determining whether Leslie Fay would have claims against the outside directors. Vis-à-vis two of those directors, Weil Gotshal had an adverse interest because it had an incentive to discount any possible liability so as to preserve its substantial client relationships with the firms of which the directors were principals. And with respect to Friedman, Weil Gotshal had represented him personally, wholly separate and apart from his affiliation with Leslie Fay.

I also find that Weil Gotshal was not disinterested relative to Seidman. Seidman was Leslie Fay's independent auditor throughout the period of the irregularities, and was therefore a very obvious target of potential plaintiffs. Indeed, Seidman was named in both the Derivative Suit and the Securities Fraud Litigation. Weil Gotshal does not deny this, nor does it deny that Leslie Fay may still have claims against Seidman.[9] Rather, it defends its disinterestedness by pointing to the relative insignificance of Seidman as a client to Weil Gotshal. (At the time of Leslie Fay's chapter 11 filing, Weil Gotshal was representing Seidman with regard to two matters, one of which was already inactive and one which subsequently became so, and the total fees in those cases approximated $40,000.) The short answer to this is that Weil Gotshal should be presumed to be loyal to its client. That the client may not be a major client is no reason to think that Weil Gotshal would ignore the relationship.

In any event, the size of the billing is irrelevant for another reason as well. Den-

nis J. Block, a Weil Gotshal partner, admitted in a deposition conducted by the examiner that Weil Gotshal would not have sued Seidman even if the facts warranted it. This, stated Block, was because Weil Gotshal represented accountants and "as a matter of Weil Gotshal policy," would therefore "not sue an accounting firm, period." (Dep. of Dennis J. Block at 126–27). Block testified that Weil Gotshal "told the audit committee and the board" of this policy, and had further told them:

> [I]f in fact it turned out that there would be a reason to take action against Seidman we would look at the facts, we'd tell them what the facts are but that would be something, ultimately, one, [sic] we'd be unwilling to handle because we don't sue accounting firms and that would be something that the company would have to deal with other counsel on.

*Id.* at 127. Although Weil Gotshal told the Audit Committee about its policy, it elected not to impart this important information to either myself or the U.S. Trustee, an omission that is simply inexcusable. There are two problems with Weil Gotshal's nondisclosure. Certainly that information was relevant to whether Weil Gotshal's retention was in the best interest of the estate given that it would not sue Seidman and retention of special counsel might have entailed additional cost to the estate. But in addition, this undisclosed condition of employment particularly when coupled with a client relationship with Seidman cast doubt on whether Weil Gotshal was the proper independent counsel to conduct the investigation into Seidman's conduct and possible liability. An unbiased investigation of the facts is no less crucial than an unbiased evaluation of the law in assessing potential claims. By unilaterally reserving the role of investigating Seidman to itself, Weil Gotshal created the "opportunity for the exercise of [its] conflicting interests," by projecting the facts in a light more favorable to Seidman than it should have. *In re Codesco*, 18 B.R. at 999. I do not say that Weil Gotshal actually did that, nor do I mean

---

9. These potential claims are currently being evaluated by counsel to the Creditors' Committee, which took responsibility for these claims after

Weil Gotshal's possible conflicts with regard to them came to light.

to disparage Weil Gotshal's integrity by suggesting that it probably would have. But when evaluating conflicts of interest, I must do so objectively, "irrespective of the integrity of the person under consideration." *In re Martin*, 817 F.2d at 181.

As Judge Friendly noted in *In re Ira Haupt & Co.*, 361 F.2d 164, 168 (2d Cir.1966), quoted with approval in *Bohack*, 607 F.2d at 263, "[t]he conduct of bankruptcy proceedings not only should be right but must seem right." And here, Weil Gotshal's conduct of an investigation where it had undisclosed ties to three of the targets just does not seem right. The better solution, as I will expand upon shortly, would have been for Weil Gotshal to decline the Audit Committee's representation. But in any case, once Leslie Fay filed for chapter 11 relief, it was no longer Weil Gotshal's decision to make. It was for the court, and not Weil Gotshal, to determine whether in fact a conflict existed and, if so, what the remedy should be. The "decision should not be left to counsel, whose judgment may be clouded by the benefits of potential employment." *Rome v. Braunstein*, 19 F.3d at 59 (citation omitted).

Weil Gotshal was also connected with Forstmann, Leslie Fay's seventh largest creditor, but I do not believe that those connections are sufficient to render Weil Gotshal interested with regard to Forstmann.

> Section 327(c) of the Code provides that ... a person is not disqualified for employment under this section solely because of such person's employment by or representation of a creditor, unless there is objection by another creditor or the United States trustee, in which case the court shall disapprove such employment if there is an actual conflict of interest.

Based upon the U.S. Trustee's submissions on his disqualification motion, it is not clear to me that the U.S. Trustee actually objects to Weil Gotshal's retention on the grounds of its Forstmann connection. However, I do not believe that Weil Gotshal's representation of Forstmann on unrelated matters constituted an actual conflict of interest in any case. At the time of its retention, Weil Gotshal was no longer Forstmann's regular

counsel and there has been no showing that Forstmann was adverse to Leslie Fay. Had there been a problem with Forstmann's claim or had Forstmann been the recipient of an alleged voidable transfer, other counsel, such as Parker Chapin (the debtors' general counsel), could have handled the matter. In other words, any possible problem with Forstmann did not go to the heart of what Weil Gotshal was retained to do. This is not to say, however, that Weil Gotshal was free to keep secret its connection with Forstmann, a subject about which I will say more later.

### 2. Weil Gotshal did not Make a Complete and Candid Disclosure as Required by Rule 2014, Thereby Causing Actual Injury to Leslie Fay

■ As I have explained, the requirements of Fed.R.Bankr.P. 2014 are more-encompassing than those governing the disinterestedness inquiry under section 327. For while retention under section 327 is only limited by interests that are "materially adverse," under Rule 2014, "all connections" that are not so remote as to be *de minimus* must be disclosed. Consequently, there is "no merit to the ... argument that [a party] did not have to disclose its connections ... because its attorneys did not feel that a conflict existed." *In re Rusty Jones, Inc.*, 134 B.R. 321, 345 (Bankr.N.D.Ill.1991). Weil Gotshal had no right to "make a unilateral determination regarding the relevance of a connection." *Arlan's*, 615 F.2d at 470.

Weil Gotshal urges that it is not necessary to disclose connections to companies with which the members of the debtor's board of directors are affiliated. As a general statement, that may have some validity. But where counsel is being retained to conduct an investigation into the actions of, among others, senior management and the members of the board of directors, most assuredly connections with entities affiliated with board members that could cause pressure on investigating counsel must be disclosed. It is by the same rationale that the connection with Seidman had to be disclosed.

■ Not only did Weil Gotshal violate Rule 2014 by not disclosing its connections to Friedman, Tarnopol and Seidman, it also vio-

lated the rule by not disclosing its connection to Forstmann, one of the largest creditors which served for a short while on the Creditors' Committee. Forstmann had employed Weil Gotshal as its regular counsel through 1991 and was still using Weil Gotshal on a more limited scale at the time of the April 5 filing. This was not merely a *de minimus* connection. The boilerplate language to the effect that Weil Gotshal may have in the past represented, currently represents, and may in the future represent entities which are claimants of the debtors was insufficient to alert the court to Weil Gotshal's representation of a creditor which was high on the list of the debtors' twenty largest creditors (from which list a creditors' committee is normally selected). The boilerplate is reasonable to cover inadvertent failures to disclose insignificant connections; it is not an adequate substitute for disclosure of representation of known and significant creditors. To rule any other way would be to eviscerate the disclosure requirements of Rule 2014(a). At a minimum, the order retaining Weil Gotshal should have carved out from the firm's role the responsibility for considering the *bona fides* of the Forstmann claim and Forstmann's prepetition course of dealing with Leslie Fay. By not disclosing its connection with Forstmann, Weil Gotshal caused the court to skip over an area which deserved some attention.

Weil Gotshal's nondisclosure caused Leslie Fay very real harm. The Creditors' Committee spent time and energy examining Weil Gotshal's relationships to determine if it should request some form of relief. Leslie Fay itself felt compelled to ask for the appointment of an examiner to inquire into Weil Gotshal's compliance with the law. Not only was this examination necessary, but because of Weil Gotshal's undisclosed relationships it was necessary as well for the examiner to insure that Weil Gotshal's work for the Audit Committee was free from reproach. In other words, the examiner had to investigate the investigation. This entailed duplication of much of what Weil Gotshal had al-

ready done, at considerable expense to the estate.[10] Weil Gotshal suggests that the Audit Committee's retention of Arthur Andersen was sufficient to "sanitize" the investigation without the necessity of the examiner reviewing the work product. I cannot agree. Whereas the accountants are competent and diligent, their role was to uncover what was wrong with the debtors' books and records, not to determine liability therefor. It was simply beyond their expertise to render any opinion on what claims Leslie Fay might possess arising out of the fraud, and whether it was worthwhile to pursue such claims. At further expense to the estate, the Equity Committee was required to respond to the motion for sanctions so as to protect its constituency. These are tangible costs which Weil Gotshal foisted upon the estate by virtue of its nondisclosure. Thus, we are not faced solely with upholding the integrity of the bankruptcy process, although, of course, that is an important concern as well.

The shame in all of this is that the heavy financial and emotional toll in this matter could have been avoided completely. For had Weil Gotshal revealed its connections at the time it requested court approval of its retention, an examiner could have been appointed early on to review and then complete the Audit Committee's investigation, and, if warranted, special counsel could have been thereafter appointed to institute suit. This arrangement might even have permitted Weil Gotshal's retention, albeit in a narrower role. Unfortunately, Weil Gotshal's silence prevented that from happening. I do not mean to suggest that I believe Weil Gotshal to have been venal. The examiner's report shows that not to have been so. Harvey Miller, the partner from Weil Gotshal who argued this motion, reminded me that he had spent the last 30 years upholding the integrity of this court. I believe him to have been truthful in that statement. But that does not excuse the firm's arrogating to itself the decision as to whether it had a conflict of interest with the case in general or with the Audit Committee investigation in particular.

10. It is true that the examiner found no problems with the Audit Committee's investigation and characterized Weil Gotshal's work on its behalf as "thorough, diligent, and professional." (Ex.

Report at 105). Nonetheless, because of Weil Gotshal's conflicts of interest, this could not be assumed but had to be confirmed by the examiner's lengthy investigation.

Weil Gotshal was mandated to reveal any connections which might cast any doubt on the wisdom of its retention and leave for the court the determination of whether a conflict existed. It did not comply with that obligation.

## D. *The Sanctions to be Granted*

■ The foregoing discussion brings us right back to where I began, with the troubling aspects of this motion. I have wide discretion in my selection of an appropriate remedy. *See In re Kelton Motors,* 109 B.R. at 654; *In re Iorizzo,* 35 B.R. 465, 468–69 (Bankr.E.D.N.Y.1983); *Iannotti,* 567 F.2d at 173. I could embrace the approach preferred by the Committees and the examiner, imposition of a monetary sanction which could be as large as the disgorgement of all fees or as small as a portion of the fees charged to the estate by the examiner and his professionals. I could also grant the motion to disqualify Weil Gotshal from further representation of the debtors and either provide or not provide for a disgorgement of fees already awarded. *See Rome v. Braunstein,* 19 F.3d at 59, n. 3 ("[C]onflict is not invariably followed by disqualification.").

As the Second Circuit noted in *Bohack,* the Circuit has been loathe in the nonbankruptcy context to separate a client from his or her chosen attorney where the alleged misconduct does not prejudice the opposing party and taint the litigation in which the attorney is appearing. Yet, the Circuit Court took pains to point out, where the choice of counsel must be approved by the court as appropriate, such that the integrity of the judicial process is implicated, the cost and delay of replacing counsel with a conflict of interest may be outweighed. 607 F.2d at 263–64. Moreover, in the bankruptcy context we are not constrained simply by the Code of Professional Responsibility but by the Bankruptcy Code itself.

There is no question but that here the facts, if disclosed, would have led to a legitimate worry that Weil Gotshal could not impartially represent the debtors in their investigation of the financial irregularities and the decisions whether and whom to sue. Because the court was not armed with the facts, there was no meaningful opportunity provid-ed for the court to determine whether to approve or disapprove Weil Gotshal's retention. Plainly, this implicates the integrity of the judicial process by which disinterested counsel is selected. On the other hand, by virtue of the reports prepared by the examiner, we know that Weil Gotshal actually performed the investigation competently and consistent with its fiduciary obligations to the estates. This suggests that the harm to Leslie Fay, which has been a victim first of an accounting scandal and then of a legal one, should assume some importance in the equation by which an appropriate sanction is selected.

Admittedly, in every bankruptcy case the replacement of counsel causes disruption. And to refuse to replace counsel simply because the facts become known only late into the process could perversely encourage professionals to hold back information from the court. But this is a special case, in more ways than one. Unfortunately, only ten days or so ago I reluctantly signed an order authorizing Leslie Fay to pay its debtor-in-possession lender a fee of $500,000 for a one-month amendment to the loan. This was necessitated by Leslie Fay's failure by a substantial margin to meet its projections, in violation of covenants contained in the loan. The information regarding Leslie Fay's financial performance became available only in September and Leslie Fay is now revising its projections and negotiating with the lender for an amendment to the debtor-in-possession financing agreement. Simultaneously, and as part and parcel of the interim agreement with the lender, Leslie Fay is preparing a term sheet for a plan of reorganization which it has committed to present to the Committees by January 15, 1995. Put differently, Leslie Fay is at a critical juncture in its reorganization efforts.

The cases have been here some 20 months. During that time Leslie Fay has endured the forced departure of its financial staff, which is a blow no debtor in possession would willingly suffer; a crippling strike this past summer; and now, financial results which are far from those targeted, necessitating an expensive reevaluation of its business strategy. The financial burdens to Leslie Fay of remaining in chapter 11 are enormous. It may not be able to withstand the great delay and

cost occasioned by the departure of the counsel with whom it has worked so long. It must begin the process of emerging from this court.

In an effort to reconcile the twin concerns of preserving the integrity of the bankruptcy process and the viability of the reorganization case, I have determined that I will permit Weil Gotshal to remain in the case to complete what it has begun. That is, Weil Gotshal may see the case through to reorganization and may finish those contested matters and adversary proceedings in which it is presently engaged. New counsel is to be brought in, however, to handle new matters such as litigation regarding claims, any avoidance actions and suits for relief arising out of the accounting irregularities. (To the extent that some of these matters could be handled more efficiently by counsel to one or the other of the committees, rather than special counsel to the debtors, I would consider that as well.) I reach this decision to retain Weil Gotshal for existing matters cognizant that the examiner found that: (i) nondisclosure aside, Weil Gotshal had performed the investigation properly and (ii) after exhaustive review, there were no viable claims to be asserted against senior management or Friedman and Tarnopol such that Weil Gotshal's conflict has now been eliminated. To the extent that Weil Gotshal may be called upon in a limited fashion to provide background to new counsel, I trust that it will not seek to charge this expense to its client, an expense caused solely by Weil Gotshal's conduct.

With respect to the economic sanction which is sought by the U.S. Trustee, relief is plainly warranted there, too, both for nondisclosure and pursuant to section 328 of the Code, which permits the court to deny compensation for services and reimbursement of expenses of a professional person retained pursuant to section 327 if, at any time during that employment, the professional person is not disinterested or holds an adverse interest to the interest of the estate with respect to the matter on which the professional person is employed. Given that I am disqualifying Weil Gotshal from handling new matters, I am limiting the economic sanction to disgorgement of the costs, direct and indirect, of both of the examiner's investigations and of the failure to disclose. This should relieve Leslie Fay of the burden imposed by its counsel. I have insufficient information to fix that number now. The costs are to include, however, not only the approximately $800,000 in fees and expenses incurred by the examiner and his professionals, but also those incurred by the Committees in dealing with Weil Gotshal's relationships and its disqualification or retention, because Leslie Fay would not otherwise have had to bear that expense. I decline to require Weil Gotshal to disgorge the fees paid it in connection with the Audit Committee investigation because that would foist upon Weil Gotshal the cost of not one, but two, investigations. One investigation would have been necessary in any event and was therefore an expense that is not related to Weil Gotshal's nondisclosure. In the event that Weil Gotshal, the Committees and the U.S. Trustee are unable to agree on the sum to be disgorged, they may schedule a further hearing to fix that number.

## CONCLUSION

The motion of the U.S. Trustee is granted in part and denied in part. SETTLE ORDER consistent with this decision.