In re IMPERIAL CORPORATION OF AMERICA, a Delaware corporation, Debtor.

**Bankruptcy No. 90–01585–A11.**

United States Bankruptcy Court, S.D. California.

April 17, 1995.

---

Weiss, Scolney, Spees, Danker & Shinderman, Michael H. Weiss, Peter N. Scolney, Los Angeles, CA, for Ronald L. Durkin.

Jeffry A. Davis, Gray Cary Ware & Freidenrich, San Diego, CA, for Shea & Gould.

## AMENDED MEMORANDUM DECISION

LOUISE DeCARL ADLER, Bankruptcy Judge.

## I

## INTRODUCTION

Ronald L. Durkin, Trustee of the Benchmark Irrevocable Trust ("Trustee"), duly authorized representative of Imperial Corporation of America ("ICA" or "Debtor") and its creditors, seeks an order compelling disgorgement of fees and reimbursed expenses in the aggregate sum of $843,003.39 by Shea & Gould ("S & G"), special litigation counsel for the Debtor. The motion is based on the grounds that S & G failed to make material disclosures in its employment application which, if made, would have caused the Court's disapproval of S & G's employment.

This motion has been considered in two phases. First, the Court wrestled with whether S & G was hired and approved as general or special counsel to the Debtor, and whether a potentially disqualified attorney serving "of counsel" to a law firm would have his disqualification imputed to the firm. In an interlocutory unpublished memorandum decision, I determined that despite the breadth of services described in the employment application and an inadvertent reference to Section 327(a) in a declaration, the Court had approved S & G's employment as special counsel. Further, I determined if an attorney "of counsel" were disqualified, such disqualification was imputable to the firm for the purpose of determining whether the firm held a "adverse interest" prohibited under Section 327(e). The motion was then contin-

ued for an evidentiary presentation regarding S & G's actual activities as special counsel.

## II

## FACTS

ICA filed its petition under Chapter 11 of the Bankruptcy Code ("Code") on February 28, 1990. On the same day, ICA applied to the court as debtor in possession to employ S & G as special corporate and litigation counsel. Specifically, S & G was to advise ICA regarding:

> [C]orporate law ...; contracts, ...; real estate ...; commercial and corporate finance ...; determination of taxes owed ... and litigation to recover tax payments refundable from previous years; federal and state regulation of debtor's business activities; and all other general corporate and business law matters and commercial litigation arising in the course of applicant's operation of its business; ...

Application of Debtor and Debtor in Possession for Authority to Employ Shea & Gould as Special Corporate and Litigation Counsel, filed March 3, 1990, at 2–3 (hereinafter "Application".)

Kurt Hunciker's Declaration accompanied the Application ("Hunciker Decl.") and stated that "Shea & Gould has not and does not represent any such person [public stockholders, and holders of public debt instruments, and indenture trustees] ... in connection with any matter involving IMPERIAL CORPORATION OF AMERICA or its subsidiaries in such matters in which it is to be engaged." (Hunciker Decl. at 4). "Shea & Gould does not hold or represent an interest adverse to these estates and is a *disinterested person* within the meaning of 11 U.S.C. § *327(a)* (sic) in the matters in which it is to be engaged...." *Id.* (emphasis added).

This Court approved the employment of S & G as special counsel. Subsequently the Court ordered payment on two interim fee applications and a final fee award. The three payments to S & G amounted to $784,938.50 in fees, and $58,064.89 in costs, for a total of $843,003.39.

In approximately May 1992, the Trustee learned of certain pre-petition relationships between Allen Tessler, an attorney "of counsel" to S & G and the Debtor. The relationships not disclosed in the S & G employment application were:

1. Tessler was "of counsel" to S & G at the time of application for S & G's employment, even though he lived in Wyoming, was not involved in day to day management of S & G, and had no office at S & G (headquarted in New York).

2. Tessler had been on the management committee of S & G until December 1988.

3. Tessler was a member of the Debtor's board of directors (the "Board") from 1983 to December 26, 1989.

4. Tessler was acting chief executive officer and president of Debtor from July 1989 to December 1989, while ICA conducted its search for a new president and CEO to replace Ken Thygerson.

5. Tessler allegedly had a contingent indemnity claim against ICA (and therefore creditor status) by way of his indemnity agreement with Debtor (allegedly similar to ICA's agreements with other officers and directors) dated November 24, 1987.

6. Tessler was a signatory defendant on the Settlement Agreement with ICA, entered February 27, 1990, releasing the signatory defendants from:

[A]ll claims . . ., demands, rights, liabilities and causes of action of every nature and description, known or unknown, asserted or that might have been asserted, including for negligence, gross negligence, breach of duty of care and/or breach of duty of loyalty) (sic), by any member of the Class or any holder of Imperial Corporation of America common stock on January 10, 1989, against the Defendants in connection with purchases of sales of Imperial common stock during the Class Period, or by any holder of Imperial Corporation of America common stock on January 10, 1990 or by Imperial against the Defendants arising out of or related to any of the acts, omissions, misrepresentations, facts, events, matters, transactions, or occurrences referred to in the complaints filed in the Litigation.

Declaration of Kurt Hunciker in Opposition to Motion for Order Compelling Shea & Gould to Disgorge Fees, Filed August 12, 1992, Exhibit N at 8.

7. Not argued by the Trustee, but disclosed in the 1989 Annual Stockholder Statement furnished as an exhibit to the opposition papers, Tessler held 283,271 shares of common stock in ICA as of 02/13/89, although allegedly did not own stock upon filing of Debtor's petition in bankruptcy.

In summary, Tessler served as a director and officer of ICA up to approximately two months before the filing of the Chapter 11 petition, and Tessler was at one point the Debtor's shareholder. Tessler was a defendant in a lawsuit which was settled the day before the commencement of the case in favor of the shareholders. Tessler, and others, received releases from ICA and the shareholders. Tessler obviously had many connections with the Debtor. The question is whether these rose to an interest materially adverse to ICA in matters on which the firm was specially employed.

## III

### DISCUSSION

Employment under 11 U.S.C. Section 327(e) does not require an attorney be disinterested. The section states:

The trustee, with the court's approval, may employ, for a specified special purpose, other than to represent the trustee in conducting the case, an attorney that has represented the debtor, if in the best interest of the estate, and if such attorney does not represent or hold any interest adverse to the debtor or to the estate with respect to the matter on which such attorney is to be employed.

The Debtor's application to employ S & G was couched in language so expansive as to give rise to the Court's earlier inquiry of whether S & G had been employed as special counsel or general counsel. At the evidentiary hearing concerning S & G's actual activities as special counsel, the Court learned that

S & G performed services in the following areas:

1. *Activities relating to the plan:* S & G represented to the Court that its involvement in the draft of the plan of reorganization was minimal. The evidence does not support this contention. Kurt Hunciker of S & G testified that he prepared a draft of the historical section of the disclosure statement—an activity which, while perhaps economically sensible for the Debtor, was clearly outside the scope of employment as special counsel. He also stated that Pat Shea of Lillick & McHose ("L & M"), general bankruptcy counsel, had asked S & G to prepare a liquidating trust document which would be incorporated in the plan of reorganization. This device was later abandoned but the estate was charged substantial fees for these bankruptcy-related services.

Sheldon Camhy, a senior partner at S & G, was a corporate litigator with the firm specializing in securities litigation. Although in testimony he minimized his role in developing the plan of reorganization, his activities as amplified in the Supplement to First Interim Application filed September 21, 1990 shows Mr. Camhy had significant involvement in strategizing with members of S & G, L & M and members of ICA's Board over the terms of a possible plan of reorganization. (*See, for example,* Exhibit I, entries on 05/07/90, 06/06/90, 06/11/90, and 06/14/90).

2. *Activities relating to avoidance of the class action settlement:* Throughout 1989, ICA was involved in various shareholder class action and derivative lawsuits which were collectively known as *Shields vs. Thygerson.* It was this action which was settled on the eve of the Chapter 11 filing with the class receiving $13 million and the defendants, including Tessler, receiving releases not only from the shareholders but also from ICA.

At the June 28, 1990 meeting of the Board, Pat Shea reviewed the plan of reorganization with the board members. S & G member Kurt Hunciker was appointed and served as assistant secretary at this meeting; [1] Sheldon Camhy was present as was Christopher Sues also of the firm. It was at this meeting that Pat Shea first recommended the filing of an avoidance action to recover the settlement funds of the class action lawsuit against ICA. The minutes of the meeting reflect:

> Extensive discussion among the Board members, Mr. Shea and Mr. Camhy then followed. At the conclusion of the discussion, the directors authorized and directed Mr. Camhy to contact the principal negotiators and drafters of the class action settlement on behalf of ICA and the directors, . . . . to see if they had any comments on the matter. The directors also requested for (sic) Mr. Camhy to report back to them in a subsequent telephonic meeting at a time to be arranged.

Exhibit 56.

At the July 6, 1990 special telephonic meeting of the Board at which Mr. Camhy and Mr. Hunciker were present and Mr. Hunciker was appointed to act as assistant secretary at the meeting, Camhy discussed his efforts at contacting the law firms representing ICA to obtain their input on Pat Shea's suggested course of action. The minutes of the telephonic meeting reflect:

> Mr. Camhy reminded the directors that the matter required expeditious action and noted that it was his firm's recommendation that Messrs. Lewis and Burke be authorized to determine what actions to take. Mr. Camhy noted that in his view, the directors were in a potential conflict for reasons which appeared obvious.

Exhibit 59.

A subsequent telephonic meeting was held on July 11, 1990 at which Camhy and Hunciker were present and Hunciker was appointed to act as assistant secretary at the meeting. It was at this meeting that Camhy related his conversation with Robert Steiner, one of the co-counsel for ICA in the class action. Mr. Steiner apparently warned the directors that they were not the proper per-

---

1. Apparently this was not the first instance in which S & G members served as officers of ICA. This practice of having partners or associates appointed and serve as assistant secretaries for board meetings of the debtor was a pre-petition practice of S & G as well. (*See* Exhibit 4). This also was not disclosed to the Court.

sons to consider whether the avoidance action should be filed and that a disinterested group would have to do so. Camhy then suggested that all of ICA's directors, except Lyman Hamilton, should resign immediately, and allow the remaining director to determine whether the avoidance action should be filed. (*See, generally,* Exhibit 60).

3. *Activities collateral to Shields vs. Thygerson:*

A. The testimony revealed that S & G participated in a number of activities indirectly relating to the *Shields vs. Thygerson* litigation. For example, after the *Shields* litigation was commenced, the Board established a special litigation committee to investigate the merits of the claims asserted. The law firm of Proskauer, Rose, Goetz and Mendelsohn was hired to analyze the merits of the claims and eventually completed a draft report known as The Proskauer Report. The Proskauer Report concluded that both the derivative claims and the class action claims had merit. Camhy testified that he believed Tessler was on the special litigation committee at the time The Proskauer Report was issued.

At some point during the pendency of ICA's Chapter 11, the FBI asked Camhy for the report. Camhy telephoned all the members of the special litigation committee including Tessler to tell them that he was going to turn over the report unless someone objected. Camhy consulted with Hunciker who told him that the report had been prepared "under privilege" and advised him to tell the FBI to subpoena the document. Interestingly, after all this consultation with Hunciker and the special litigation committee, Camhy claims he turned over the report without waiting for the subpoena!

B. On May 28, 1990 the FDIC notified the directors and officers insurance carriers of ICA/ISA that various directors and officers of ISA/ICA were potentially targets of claims under the directors and officers policies held by ISA. Those directors included Tessler as well as Lyman Hamilton, a current board member of ICA. (Exhibit 32). Hunciker undertook not only to forward the claim to ICA's insurance carriers but also to draft a letter to the FDIC on behalf of the directors. Hunciker testified that Hamilton asked either him or Camhy to respond to the letter. Hunciker "ghost wrote" a letter to the FDIC, (Exhibit 53), "on behalf of Robert E. Alshuler, Allan R. Tessler, Victor N. Goulet, Richard A. Archer, Stewart I. Greenbaum and myself [Lyman Hamilton]" denying any basis for claims against them. Although Hunciker states that the draft letter was never sent, the estate was billed for time in review of the FDIC claims and draft of the response. (*See* Exhibit J, entries on 05/30/90, 06/07/90, and 06/14/90).

C. Certain of the co-plaintiffs in the *Shields* litigation opted out of the class action and brought separate claims against ICA. Dr. Bernard Fidel, one of the opt-out claimants, wrote Hunciker on March 16, 1990, (Exhibit 7), asking that Hunciker discuss with him a settlement of his claims. From his March 28, 1990 time entry, it appears Hunciker billed the estate for drafting a response and talking with bankruptcy counsel about the letter before he referred it to the class action counsel.

The foregoing summary of S & G's activities is not, of course, exclusive. There were many services which did not implicate the specter of "adverse interests"—for example, S & G's litigation services relating to the tax refund or challenging the constitutionality of the RTC takeover and services relating to terminating the employee benefit plan. On the other hand, the foregoing description of actual services by S & G does not include all those which the Court considers borderline.

In his opening statement, S & G's counsel conceded that S & G did not comply with Fed.R.Bankr.P. 2014 by disclosing its connections to the Debtor. However, he claims there is no evidence of S & G's intent not to disclose. The Trustee's counsel argues that S & G's non-disclosure was not so innocent. He points to Exhibit 64 which was filed in response to the Court's questions regarding S & G's first interim application for fees. When the Court required additional information about Camhy's services to the Debtor, Hunciker filed it in the form of the declaration, (Exhibit 64), which contains among its entries at Bates stamp 548–9:

Legal questions regarding seizure of ISA in conferences with former partner and later of counsel to Shea & Gould (Director of ICA and Emergency CEO of ICA from July 5, 1990, to approximately 12/11/90 following the removal of earlier management.) (sic) Discussion of various items of business occurring during his tenure as CEO.

It is this entry which takes conspicuous pains *not* to identify Tessler by name that the Trustee argues is substantial evidence of S & G's intent to mislead the Court. It is for this reason the Trustee insists that S & G be required to disgorge all fees paid.

The distinction between employment under Section 327(e) and Section 327(a) of the Bankruptcy Code is important. Section 327(a) governs the employment of an attorney to represent the trustee or debtor in possession generally in the bankruptcy case. It requires that the attorney "not hold or represent an interest adverse to the estate" and be a disinterested person. The attorney must satisfy the court that he or she does not have an actual conflict of interest with the estate and is a disinterested person. To be disinterested, Section 101(14) requires that the attorney not be a creditor, equity holder, insider, investment banker, *director, officer or employee of the debtor,* not have an interest materially adverse to the interest of the estate ... by reason of any direct or indirect relationship to, connection with or interest in the debtor. Obviously, S & G could not have been approved for employment under Section 327(a) because of Tessler's service as a director and officer of the Debtor for a period within two years before the date of the filing of the petition. Also, S & G's pre-petition practice of serving as assistant secretary would have been a bar. Section 101(14)(D).

■ Sections 327(e) is not as strict in disqualifying attorneys. Under Section 327(e), special counsel need not be disinterested but merely not represent or hold any interest adverse to the debtor or to the estate with respect to matters on which counsel is to be employed.

While it is true that this Court previously held that the specific services to be performed by S & G described in their employment application, while broad, were nonetheless special counsel services, I find myself in the same position as my esteemed colleague in *In re D.L. Enterprises,* 89 B.R. 107 (Bankr.C.D.Cal.1988) who observed:

I am upset because when asked to approve the Application, I did not have all the material facts necessary to make a sound judgement. Certainly, if I had known about the lawsuits and the true extent of the animosity between GLA and debtor, OHL and Dennehy, I would have not put the estate or myself in the difficult position of having to determine whether services performed by MJDP were for the benefit of the estate or OHL and Dennehy.

*Id.* at 110.

In this case, I can say with equal certainty that had I known about the connections between S & G and the Debtor, the scope of services S & G was authorized to perform as special corporate and litigation counsel would have been severely contracted. Although S & G's prior connections with the Debtor may not have required this Court to disqualify it with respect to determination of taxes owed, tax refund litigation, complying with federal and state regulation (*e.g.,* filing 10–K reports) and some general corporate matters such as termination of the employee benefit plan, the Court never would have approved *carte blanche* its request to be employed on "all other general corporate and business law matters and commercial litigation arising in the course of applicant's operation of its business." (Exhibit B at 3) As observed by Judge Ryan in *D.L. Enterprises,* "to do otherwise would invite the same kind of problems that I have to resolve here." *D.L. Enterprises,* 89 B.R. at 111.

■ The difficulty S & G has created for itself is that some of the services it performed as "special counsel", when examined in the cold light of an evidentiary hearing, appear to have been in the nature of general counsel services which the firm was not authorized to perform. Plan strategizing, plan drafting, advising the Debtor's board members on the proposed avoidance action, monitoring the class action settlement and dealing with claims made against the Debtor's di-

rectors are all activities which were either tasks for general bankruptcy counsel or tasks for which S & G held an interest adverse to the Debtor.

Further, it is clear from the evidence, S & G would have been disqualified from performing those services as general bankruptcy counsel under Section 327(a). According to the analysis found in *In re Weibel, Inc.,* 176 B.R. 209 (9th Cir. BAP 1994) the firm must be barred from receipt of any compensation for those services:

> Under these factors, the professional must demonstrate that it was qualified to act on behalf of the estate pursuant to Section 327. In other words, the professional must show that it was disinterested. If the professional is not disinterested, then fees are not to be awarded. These criteria demonstrate a clear policy in this Circuit.

*Weibel,* 176 B.R. at 213.

The *Weibel* court went on to affirm the bankruptcy judge's ruling that an award of fees to a law firm whose partner was a director of the debtor was not appropriate under Section 503(b)(1) or Section 503(b)(2).[2]

The services which the Court considers in the category of services outside the scope of special counsel and/or special counsel services for which S & G held an interest adverse to the Debtor or the estate include those described on pages 6–10 above. While the Court has not attempted to calculate a dollar amount attributable to these services, I leave it to the Trustee to identify the offending entries and calculate the fees charged to the estate for such services. The Trustee's identification and calculations are to be served upon S & G which will have thirty (30) days from service of the Trustee's calculations to file opposition disputing the designation of particular entries. In the event the parties cannot resolve their positions after this exchange, the Court may refer the matter to an examiner appointed for the limited purpose of determining the amount S & G will be required to disgorge.

■ Further, there is the question of additional sanctions for failure to disclose under Fed.R.Bankr.P. 2014 all of S & G's connections with the Debtor and its creditors. The reliability of disclosure under Fed. R.Bankr.P. 2014 is paramount to the ability of this Court to make informed decisions on employment applications. As stated in *D.L. Enterprises:*

> Compliance with Rule 2014 is necessary and critical to the orderly implementation of § 327. Unless there is full disclosure, the court cannot make an informed decision.
>
> I approve hundreds of applications for employment each year. I assume I am receiving full disclosure from debtors and counsel. Without this trust, the appointment process would grind to a halt. No bankruptcy judge can or should condone any erosion of this trust.

*D.L. Enterprises,* 89 B.R. at 112–13.

In a similar situation, Judge Brozman in *In re Leslie Fay Companies, Inc.,* 175 B.R. 525 (Bankr.S.D.N.Y.1994) observed:

> Rule 2014 disclosure requirements are to be strictly construed. (Citations omitted). All facts that may have any bearing on the disinterestedness of a professional must be disclosed. Consistent with the duty placed on the professional, it is the responsibility of the professional, not of the court, to make sure that all relevant connections have been brought to light. (Citations omitted). *So important is the duty of disclosure that the failure to disclose relevant connections is an independent basis for the disallowance of fees or even disqualification* (emphasis added) (citations omitted).

*Leslie Fay,* 175 B.R. at 533.

While S & G's nondisclosure cannot be directly connected to actions taken adverse

---

2. The BAP opinion in *Weibel* was issued shortly after the ruling in *In re Occidental Financial Group, Inc.,* 40 F.3d 1059 (9th Cir.1994). While the *Occidental* court left undecided the question of whether a § 503(b) award could be made to an attorney disqualified under § 327(a), (*see Occidental* at 1062), the BAP's analysis in *Weibel*

persuades this Court that an attorney barred from compensation under § 327(a)'s tests cannot "end run" that section by seeking compensation under § 503(b). The same reasoning applies to bar compensation for services which a disqualified attorney renders under Section 327(e).

to the Debtor, its nondisclosure caused the Debtor very real harm. The Trustee and its counsel have expended time and money investigating S & G's relationship to the Debtor. This motion, the discovery, the two hearings and the time necessary to review each entry of S & G's fee application to determine amounts subject to disgorgement are tangible costs which S & G has foisted upon this estate. These could have been avoided with appropriate disclosure when the firm requested court approval of its retention. The economic interests of the firm in retaining the maximum amount of business of an existing client forced to file a Chapter 11 case should not have been allowed to override its integrity. While this observation may seem harsh, after a review of the evidence, I am left with the distinct impression S & G's failure to disclose was not "inadvertent."

I have wide discretion to tailor an appropriate sanctions remedy. *See, In re Leslie Fay,* 175 B.R. at 533–38; *D.L. Enterprises,* 89 B.R. at 112; and, *In re Wilde Horse Enterprises, Inc.,* 136 B.R. 830, 842–45 (Bankr.C.D.Cal.1991). In this instance it appears that the appropriate sanction is to impose the entire cost of this motion on S & G rather than ordering disgorgement of all of its compensation. There were after all services S & G rendered that benefitted the estate and were within its special counsel charge. This sanction, along with disgorgement of fees attributable to services which S & G would have been prevented from rendering had the full disclosure been made, will not only make the estate whole but also preserve the integrity of the system.

This Amended Memorandum Decision is in lieu of findings of fact and conclusions of law. Trustee's counsel is directed to prepare an order in accordance with this Amended Memorandum Decision within ten (10) days of the date of entry.