**In re ETOYS, INC., et al., Debtors.**

**Nos. 01–706 (MFW) to 01–709 (MFW).**

United States Bankruptcy Court, D. Delaware.

Oct. 4, 2005.

**182**

Mark Minuti, Esquire, Saul Ewing LLP, Wilmington, DE, G. David Dean, Esquire, Saul Ewing LLP, Baltimore, MD, for Barry Gold.

Frederick Rosner, Esquire, Jaspan Schlesinger Hoffman LLP, Wilmington, DE, for the Committee.

James L. Garrity, Jr., Esquire, Shearman & Sterling LLP, New York, NY, Ronald R. Sussman, Esquire, Kronish Lieb Weiner & Hellman LLP, New York, NY, for Traub, Bonacquist & Fox LLP.

John J. Rapisardi, Esquire, Weil, Gotshal & Manges LLP, New York, NY, for Goldman Sachs & Co.

## OPINION [1]

MARY F. WALRATH, Bankruptcy Judge.

Before the Court are Motions filed by a shareholder, Robert Alber ("Alber"), and an administrative claimant, Collateral Logistics, Inc. ("CLI"), against Barry Gold ("Gold"), Morris Nichols, Arsht & Tunnell ("MNAT") and Traub, Bonaquist, Fox LLP ("TBF") and certain of their partners

---

**1.** This Opinion constitutes the findings of fact and conclusions of law of the Court pursuant to Federal Rule of Bankruptcy Procedure 7052, which is made applicable to contested matters by Federal Rule of Bankruptcy Procedure 9014.

(collectively "the Respondents") seeking removal, disgorgement of fees, and sanctions for contravening the disclosure requirements of Bankruptcy Rule 2014 and the conflict of interest prohibitions of section 327(a) of the Bankruptcy Code. The Movants also ask the Court to refer the matter for criminal and disciplinary investigations. The Respondents oppose the Motions. The United States Trustee (the "UST") initially filed a Motion seeking disgorgement of fees from TBF but now seeks approval of a settlement of that Motion. A Motion seeking approval of a settlement with Goldman Sachs & Co. ("Goldman") is also pending. For the reasons set forth below, the Court will strike the CLI Motion, grant the Alber Motion as to MNAT in part, and approve the TBF and Goldman settlements. The Court will deny Alber's Motion as to Gold, but articulates herein a new requirement that officers of a debtor must in the future disclose any connections they have with other parties in the case which create a potential or actual conflict of interest.

## I. BACKGROUND

On March 7, 2001 ("the Petition Date"), eToys, Inc., and certain of its affiliates (collectively "the Debtors") filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. The Debtors were electronic retailers of toys and other children's products.

On April 5, 2001, the Debtors filed applications to retain two firms as their bankruptcy attorneys: Irell & Manella ("Irell") and MNAT. The UST objected to Irell's retention arguing that Irell was not disinterested under section 327(a) because Peter Juzwiak, the Debtors' Vice President and General Counsel, was to join the firm as a partner effective April 30, 2001. As a result, Irell was retained as special counsel only.

In connection with the MNAT retention application, partner Robert Dehney ("Dehney") submitted an affidavit listing parties in interest in the case that the firm had represented within the previous three years or was representing at the time. (None of the other representations were on matters related to the Debtors.) The Dehney Affidavit failed to disclose that, at that time, MNAT was representing General Electric Capital Corporation ("GECC") and two affiliates of Goldman ("the Goldman Affiliates") in the bankruptcy case filed by Finova Capital Corporation ("Finova") on the same day that the Debtors filed their case. No objections were filed to the MNAT application and, as a result, the Court approved MNAT's retention on April 25, 2001.

On March 16, 2001, the UST appointed the Official Committee of Unsecured Creditors ("the Committee"). The Committee retained TBF as its counsel, which was approved by the Court on April 25, 2001. On May 21, 2001, the Debtors hired Gold to coordinate their liquidation. On July 23, 2001, after the Debtors had obtained D & O insurance, Gold was named President and CEO. At no time did Gold or TBF disclose that Gold and TBF's senior partner, Paul Traub, were partners in an entity known as Asset Disposition Advisors, LLC ("ADA") or that, TBF paid Gold $30,000 a month from February to May 2001 for his services to ADA.

On November 1, 2002, the Court confirmed the Debtors' First Amended Consolidated Liquidating Plan of Reorganization ("the Plan"), which went effective on November 5, 2002. Pursuant to the Plan, the Debtors' remaining assets were vested in EBCI, Inc. (the "Reorganized Debtor"), which was to be managed by a Plan Administrator. Gold was appointed as the Plan Administrator and retained MNAT as counsel for the Reorganized Debtor. The

Committee was dissolved and succeeded by the Post Effective Date Committee (the "PEDC"). The liquidation of the Reorganized Debtors' assets is close to conclusion. The secured and priority creditors have largely been paid in full and unsecured creditors are expected to receive a distribution of approximately 16%. Shareholders will receive no distribution.

On November 24, 2004, the PEDC filed a Motion for approval of a settlement it had reached with Goldman for the return of $200,000 of a success fee which had been paid pre-petition by the Debtors. Alber and CLI filed objections to that Motion asserting that the attorneys and members of the PEDC had conflicts of interest.

On December 20, 2004, Alber filed an emergency Motion for sanctions and related relief against Gold, TBF and certain of its partners. On December 22, 2004, CLI filed a similar Motion. On January 25, 2005, Alber filed a Motion against MNAT purportedly on behalf of himself and other shareholders which also seeks disqualification and disgorgement of fees. Objections were filed by the Respondents.

On February 15, 2005, the UST filed its own Motion which sought disgorgement of fees from TBF (the "Disgorgement Motion"). The Disgorgement Motion was subsequently settled and a Motion to approve the settlement was filed on February 24, 2005 (the "Settlement Motion"). Alber and CLI filed pleadings in support of the Disgorgement Motion and in opposition to the Settlement Motion.

A hearing on all the Motions was held on March 1, 2005, at which evidence and testimony were presented in support of the parties' positions. At the conclusion, the Court permitted additional briefing by the parties to explain their positions based on the facts that had been presented.[2] That briefing is complete and the issues are now ripe for decision.

## II. JURISDICTION

This Court has jurisdiction pursuant to 28 U.S.C. §§ 1334 & 157(b)(2)(A), (B) & (O).

## III. DISCUSSION

Alber alleges that the Respondents violated Bankruptcy Rule 2014 and section 327(a) of the Bankruptcy Code by not disclosing connections to other parties in the case, some of which he asserts are actual conflicts of interest. Alber contends that the delayed disclosure was intentional and that even the subsequent disclosure of the relationships failed to comply with the requirements of the Rule. Finally, Alber suggests that the Respondents violated Bankruptcy Rule 2016, Rule 11 and various provisions of title 18. Alber asks the Court to: (1) compel the Respondents to disgorge all payments that they have received to date in the case; (2) dismiss MNAT and TBF as counsel to the Reorganized Debtor and the PEDC, respectively; (3) permit Alber to conduct far-ranging discovery of the Reorganized Debtor and counsels' records; (4) appoint a trustee; and (5) refer the entire matter for additional criminal and disciplinary investigations into the conduct of the case.

### A. Preliminary Arguments

The Respondents raise preliminary arguments that the Court is precluded from even addressing the merits of the Motions.

---

**2.** The Court directed the parties to complete briefing by March 15, 2005. Despite that direction, Alber and Mr. Haas, purportedly on behalf of CLI, have continued to file pleadings related to the issues at bar. The Court has stricken those pleadings. Further, the pleadings filed by Mr. Haas on behalf of CLI have been stricken because a corporation must have counsel represent it in federal court. See Discussion infra at Part A1.

### 1. CLI Motion

At the hearing it was asserted that the Motion filed by CLI was procedurally improper because it was filed by a corporation without benefit of an attorney. The Court agreed and ruled that CLI, as a corporation, may not file pleadings or appear except through counsel. *Rowland v. California Men's Colony*, 506 U.S. 194, 202, 113 S.Ct. 716, 121 L.Ed.2d 656 (1993) ("It has been the law for the better part of two centuries ... that a corporation may appear in the federal courts only through licensed counsel."). Therefore, the pleadings filed by CLI have not been considered.[3]

### 2. Jurisdiction over the PEDC and Reorganized Debtors

The Respondents also assert that the Court lacks jurisdiction over the PEDC, the Reorganized Debtor, and the Plan Administrator. Section 5.3(c)(v) of the Plan empowers the Plan Administrator to select, retain and compensate professionals without approval of the Court. Therefore, the Respondents assert that the Court does not have the power to remove TBF and MNAT from their post-confirmation employment as requested by Alber.

The Plan does, however, expressly provide that the Court retains jurisdiction to remove the Plan Administrator for cause. (*See* Plan at § 5.2.) *See also Griffin Resorts, Inc. v. Price Waterhouse & Co. (In re Resorts Int'l, Inc.)*, 372 F.3d 154, 161 (3d Cir.2004) (holding that "Retention of jurisdiction provisions will be given effect, assuming there is bankruptcy court jurisdiction.")

Notwithstanding that retention language, however, the post-confirmation jurisdiction of the Bankruptcy Court is ex-tremely limited. *See, e.g., Resorts Int'l*, 372 F.3d at 161 (concluding that, notwithstanding retention of jurisdiction provisions in a plan, "neither the bankruptcy court nor the parties can write their own jurisdictional ticket. Subject matter jurisdiction 'cannot be conferred by consent' of the parties.... Where a court lacks subject matter jurisdiction over a dispute, the parties cannot create it by agreement even in a plan of reorganization.") (citations omitted); *Walnut Assocs. v. Saidel*, 164 B.R. 487, 491–92 (E.D.Pa.1994) ("Although the jurisdiction of the bankruptcy court continues until the Chapter 11 case is closed, once a plan has been confirmed, the court's jurisdiction begins to weaken.") (citations omitted).

The Bankruptcy Court, however, does retain jurisdiction post-confirmation to enforce the Plan. 11 U.S.C. § 1142(b) ("[t]he court may direct the debtor and any other necessary party ... to perform any ... act ... that is necessary for the consummation of the plan."). *See, e.g., In re Terracor*, 86 B.R. 671, 676 (D.Utah 1988) ("The clear intent of section 1142(b) is for the court to retain its jurisdiction to assure that the terms and provisions of the confirmed Chapter 11 plan are carried out until the plan is completed and a final decree is entered closing the case.").

The Court concludes, nonetheless, that the issue of replacement of professionals for the PEDC and the Reorganized Debtors or the Plan Administrator does not fall within that limited jurisdiction. The identity of the Plan Administrator or its professionals does not have such a significant impact on the estate for the Court to conclude that it is related to the bankruptcy case. This case is factually indistinguishable from the *Resorts Int'l* case where the

---

**3.** This has not, however, diminished the issues addressed by the Court because Alber's plead-ings are substantially identical to CLI's pleadings.

Third Circuit held that the bankruptcy court did not have jurisdiction over a suit by the post-confirmation trust against a trust professional for post-confirmation activities, notwithstanding the retention of jurisdiction language in the plan and confirmation order. 372 F.3d at 161. Therefore, the Court will deny Alber's request to replace Gold, MNAT and TBF in their post-confirmation roles. The Court does, however, have jurisdiction to deal with the issues raised by the parties' pre-confirmation actions.

### 3. *Appointment of Trustee or Examiner*

■ The Respondents further argue that Alber's request for the appointment of a trustee or examiner must be denied. Section 1104 of the Bankruptcy Code, which provides the authority for such an appointment, states:

(a) At any time after commencement of the case but *before confirmation of a plan,* on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of a trustee—

(1) for cause . . . ; or

(2) if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate. . . .

(c) If the court does not order the appointment of a trustee under this section, then at any time *before the confirmation of a plan,* on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of an examiner . . . if—

(1) such appointment is in the interests of creditors, any equity security holders, and other interests of the estate; or

(2) the debtor's fixed, liquidated, unsecured debts, other than debts for goods, services, or taxes, or owing to an insider, exceed $5,000,000.

11 U.S.C. § 1104 (emphasis added). Because the Debtors' Plan has been confirmed, the Respondents assert that Alber's request for appointment of a trustee or examiner must be denied. The Court agrees that such a remedy is unavailable based on the express language of the Code.

### 4. *Appointment of Equity Committee and Counsel*

■ Alber also seeks the appointment of an equity committee and counsel to permit him to continue to investigate this case. The Court concludes that such a request is not warranted. Though section 1102(a)(2) authorizes the Court to order the appointment of additional committees of creditors or equity security holders, it may do so only "if necessary to assure adequate representation" of those parties. In this case there is no necessity to appoint a committee for equity security holders because their interests have been extinguished by the Debtors' Plan and they will receive nothing from the estate. (*See* Plan at §§ 4.10.2 & 7.1(b).) *See, e.g., In re Kalvar Microfilm, Inc.,* 195 B.R. 599, 601 (Bankr.D.Del.1996) (denying appointment of equity committee where request was made after plan and disclosure statement were filed). Therefore, the Court will deny the request for appointment of an equity committee and counsel because it will provide no benefit to the estate and is simply too late.

### 5. *Bad Faith*

■ The Respondents assert that the Motions were filed in bad faith. Specifically, Gold asserts that the CLI Motion was filed in response to the Plan Administrator's objection to CLI's claim. Gold ar-

gues that CLI's Motion was filed to gain leverage in that contested matter.

MNAT argues that Alber's request for relief is "a strategic ploy" to improve his position under the established liquidation scheme. MNAT states that Alber has made it clear that he would like the Debtors' shareholders to gain control of the Reorganized Debtor. MNAT notes further that Alber faxed the Motion to the firm within hours after he was served with the Reorganized Debtor's objection to Alber's Motions to disqualify TBF and Gold.

Even if the Motions were filed in bad faith, however, they raise serious questions about the disclosure of conflicts and connections made by both counsel for the Debtors and for the Committee in this chapter 11 case. Disclosure "goes to the heart of the integrity of the bankruptcy system." *In re B.E.S. Concrete Prods., Inc.*, 93 B.R. 228, 236 (Bankr.E.D.Ca.1988). Therefore, the Court is compelled to address the merits of the Motions.

### 6. *Exculpations*

■ The Respondents assert that the allegations regarding their activities prior to confirmation of the Debtors' Plan are barred by the exculpations they received under the Plan. The Plan provided releases to Gold, MNAT and TBF for "any act taken or omission occurring on or after the Petition Date in connection with or related to the Debtors, the Plan Administrator or the Chapter 11 Cases ... except for acts constituting willful misconduct or gross negligence." (*See* Plan at § 7.2(e).) This provision is consistent with Third Circuit authority. *See, e.g., In re United Artists Theatre Co.*, 315 F.3d 217, 230 (3d Cir. 2003) (holding that indemnification provision in retention application of professional which excludes gross negligence and willful misconduct is consistent with professional's fiduciary duty to the estate under

the Bankruptcy Code and Delaware law); *In re PWS Holding Corp.*, 228 F.3d 224, 246 (3d Cir.2000) (holding that release in plan of committee's professionals from liability for acts other than gross negligence or willful misconduct is consistent with the Bankruptcy Code).

The allegations in Alber's Motions are, however, that the parties had actual conflicts of interest which they knowingly failed to disclose at the time of their retention and throughout the case. If this is true, the Court concludes that the exculpation clause would not protect the Respondents because it constitutes willful misconduct. Therefore, the Court concludes that the releases do not preclude Alber from pressing his Motions.

### 7. *Timeliness of Motions*

■ MNAT asserts that, even absent a finding that Alber has brought the Motions in bad faith, Alber's right to obtain relief is time-barred under Rule 60(b). Rule 60(b) allows the Court to revoke or modify earlier orders and provides, in relevant part:

> On motion and upon such terms as are just, the court may relieve a party ... from a final judgement ... [or] order ... for the following reasons: (1) mistake, inadvertence, surprise or excusable neglect; (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud ... misrepresentation, or other misconduct of an adverse party ... or (6) any other reason justifying relief from the operation of the judgment. The motion shall be made within a reasonable time, and for reasons (1), (2), and (3) not more than one year after the judgment ... [or] order ... was entered or taken.

Fed.R.Civ.P. 60(b).

MNAT claims that sections (1), (2) or (3) are the only conceivable bases under which

Alber could seek relief, which limits the time for bringing the motion to one year. MNAT notes that the Orders from which the Motions seek relief were all entered more than one year ago. Therefore, MNAT asserts that relief is simply not available to Alber under Rule 60(b).

■ While MNAT is correct that Alber could have been entitled to relief from the Orders under sections (1), (2) and (3) of Rule 60(b), Rule 60(b)(6) allows a court to reconsider an order for "any other reason justifying relief from the operation of the [order]." Fed.R.Civ.P. 60(b)(6). "To justify relief under subsection (6), a party must either show some 'other reason' justifying relief outside of the earlier clauses of the Rule, or, if the reasons for seeking relief could have been considered in an earlier motion under another subsection of the rule, [he] must show 'extraordinary circumstances' suggesting the party is faultless in the delay." *In re Benjamin's–Arnolds, Inc.*, No. 4–90–6127, 1997 WL 86463, at *10 (Bankr.D.Minn. Feb. 28, 1997).

Such "extraordinary circumstances" are present in this case. If the professionals did not disclose their conflicts or other connections with others in the case to the Court, or did so in ways that clearly contravened the statutory requirements, then parties did not have sufficient notice to seek relief under Rule 60(b)(1), (2) or (3) within the prescribed one-year time limit. In fact, many of the relationships were revealed only in response to Alber's Motion.

Furthermore, the disclosure obligation mandated by the Bankruptcy Code and Rules "implicates a public policy interest justifying relief ... under Rule 60(b)(6)." *In re Southmark Corp.*, 181 B.R. 291, 295 (Bankr.N.D.Tex.1995) (granting relief under Rule 60(b)(6) from final fee order which had been entered nearly three years earlier). *See also Hazel–Atlas Glass Co. v. Hartford–Empire Co.*, 322 U.S. 238, 244–45, 64 S.Ct. 997, 88 L.Ed. 1250 (1944) (holding that fraud upon the court equitably tolls the time for seeking to set aside a judgment or order); *Pearson v. First NH Mort. Corp.*, 200 F.3d 30, 35–41 (1st Cir. 1999) (holding that attorney's false disclosure which denied any connection with creditors could support a finding that attorney had committed a fraud on the court); *Benjamin's–Arnolds*, 1997 WL 86463, at *10 (holding that "the failure of an attorney employed by the estate to disclose a disqualifying conflict of interest, whether intentional or not, constitutes sufficient 'extraordinary circumstances' to justify relief under Rule 60(b)(6). To hold otherwise would only serve to penalize the [Plaintiff] for delay that was beyond his control and to reward conflicted attorneys for failing to disclose their conflicts beyond the one-year period.").

In this case it is alleged that the professionals did not disclose conflicts of interest that would have barred their retention. If this is true, it would constitute a fraud on the Court warranting relief even though more than a year has passed since the professionals were retained and their fees approved. Therefore, the Court concludes that Rule 60(b)(6) allows the Court to consider Alber's Motions.

### B. *MNAT and its Partners*

Alber seeks an order disqualifying MNAT from serving as counsel to the Debtors and disgorgement of all fees earned by MNAT and its partners who worked on the case. The basis of his Motion is that MNAT failed to disclose in its retention application that it had a conflict of interest because it was concurrently representing the Goldman Affiliates and GECC in the *Finova* case. GECC was a creditor in this case and the Debtors had

claims against Goldman (including litigation that is currently being prosecuted by the PEDC).

MNAT opposes the Motion arguing that: (1) it made "timely, adequate and candid" disclosures of its connections to the Goldman Affiliates in full compliance with the requirements of Bankruptcy Rule 2014; (2) the late supplemental disclosure of its connection to GECC was the result of "an inadvertent oversight"; and (3) its representation of the Debtors in the case was consistent with section 327(a) of the Code.

### 1. *Disinterestedness and Adverse Interests*

Section 327(a) of the Bankruptcy Code governs a debtor's employment of attorneys in a bankruptcy case. It provides, in relevant part:

> The [debtor], with the court's approval, may employ one or more attorneys ... that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the [debtor] in carrying out [its] duties under this title.

11 U.S.C. § 327(a).

■ Thus, counsel for a debtor must not hold or represent an interest adverse to the estate. An adverse interest is generally defined to mean "any economic interest that would tend to lessen the value of the bankruptcy estate or that would create either an actual or potential dispute in which the estate is a rival claimant." *TWI Int'l v. Vanguard Oil Serv. Co.*, 162 B.R. 672, 675 (S.D.N.Y.1994). *See also, In re National Liquidators, Inc.*, 182 B.R. 186, 192 (S.D.Ohio 1995).

■ Further, under section 327 of the Code, counsel for the debtor must also be "disinterested." Disinterestedness is defined to mean that counsel "does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor ... or for any other reason." 11 U.S.C. § 101(14)(E). *See also, TWI Int'l*, 162 B.R. at 675.

### 2. *Disclosure Requirements*

Bankruptcy Rule 2014 provides the mechanism for enforcing the provisions of section 327(a) by requiring disclosure of the attorney's relationships with parties in interest in the case. Rule 2014 requires that an application to retain counsel for the debtor:

> be accompanied by a verified statement of the person to be employed setting forth the person's connections with the debtor, creditors, or any other parties in interest, [and] their respective attorneys and accountants.

Fed. R. Bankr.P.2014(a).

Disclosure "goes to the heart of the integrity of the bankruptcy system." *B.E.S. Concrete*, 93 B.R. at 236. Therefore, the duty to disclose under Bankruptcy Rule 2014 is considered sacrosanct because the complete and candid disclosure by an attorney seeking employment is indispensable to the court's discharge of its duty to assure the attorney's eligibility for employment under section 327(a) and to make an informed decision on whether the engagement is in the best interest of the estate. *See, e.g., In re Leslie Fay Cos.*, 175 B.R. 525, 533 (Bankr.S.D.N.Y.1994). *See generally* 9 Collier on Bankruptcy ¶ 2014.03 (15th ed.2004). The bankruptcy court must be given timely and complete disclosure by the debtor's attorney of all connections with parties in interest in the case to "exercise its own ongoing affirmative responsibility 'to root out impermissible conflicts of interest' under Bankruptcy Code §§ 327(a) and 328(c)." *Rome v.*

*Braunstein,* 19 F.3d 54, 58 (1st Cir.1994). *See also, In re BH & P, Inc.,* 949 F.2d 1300, 1315 (3d Cir.1991).

Consequently, Bankruptcy Rule 2014 requires that the attorney seeking employment disclose to the Court *all connections* with parties in interest in the case, rather than furnishing only those which appear to implicate "disinterestedness" or "adverse interest" concerns under section 327(a). *See, e.g., In re Filene's Basement, Inc.,* 239 B.R. 850, 856 (Bankr. D.Mass.1999) (holding that the requirements of Bankruptcy Rule 2014 "transcend those of § 327(a), as they mandate disclosure of all connections with the [applicant] rather than being limited to those which deal with disinterestedness.").

Furthermore, the duty to disclose is ongoing. Local Rule 2014–1 provides: "Promptly after learning any additional material information relating to [its] employment (such as potential or actual conflicts of interest), the professional employed or to be employed shall file and serve a supplemental affidavit setting forth the additional information." Del. R. Bankr.P.2014–1. *See also, Rome,* 19 F.3d at 57–58 ("[A]s the bankruptcy court is invested with ample power to deter inappropriate influences upon the undivided loyalty of court-appointed professionals *throughout their tenure,* the need for professional self-scrutiny and avoidance of conflicts of interest does not end upon appointment.") (emphasis in original); *In re Tinley Plaza Assocs., L.P.,* 142 B.R. 272, 278 (Bankr.N.D.Ill.1992) ("[T]he duty to disclose continues beyond the initial stage of application to employ counsel.... If a conflict arises after attorneys are employed by the debtor-in-possession, such conflict must be disclosed to the court and the court must immediately disqualify the attorney.") (citations omitted).

"So important is the duty of disclosure that the failure to disclose relevant connections is an independent basis for the disallowance of fees." *Leslie Fay,* 175 B.R. at 533. *See also, Rome,* 19 F.3d at 59 ("Absent the spontaneous, timely and complete disclosure required by section 327(a) and Fed. R. Bankr.P.2014(a), court-appointed counsel proceed *at their own risk.*") (emphasis in original).

### a. *Goldman and its Affiliates*

MNAT argues that it was not aware of Goldman's involvement in this case at the time it filed its retention application because Goldman was not a creditor. In addition, because MNAT had not represented the Debtors before the case was filed (and was originally only to serve as local counsel), it was not aware of the Debtors' pre-petition transactions with Goldman which led to the conflict.

Prior to the bankruptcy filings, the Debtors had engaged Goldman to obtain a sale, merger or capital infusion for their ailing businesses. Pursuant to an engagement letter, the Debtors advanced Goldman $150,000 for out-of-pocket expenses and a $3 million success fee. That letter provided, however, that $2.5 million of the success fee was refundable if Goldman did not facilitate the sale of the Debtors' assets for at least $20 million or fifty percent of their outstanding stock. As of the Petition Date, the only transaction which had been consummated under the Goldman retention letter was the sale of BabyCenter LLC for approximately $12 million.

After the bankruptcy cases were filed, MNAT became aware of the dispute between the Debtors and Goldman. On May 25, 2001, MNAT wrote to Goldman on behalf of the Debtors requesting at least $2.5 million of the success fee be returned. The matter was resolved by a Termination Agreement in August, 2001, pursuant to

which Goldman returned approximately $2.55 million to the Debtors. MNAT admits, however, that by early June, 2001, it was aware that the Debtors had substantial other claims against Goldman. Rather than file a supplemental disclosure of its conflict, MNAT states that it "solved" the problem by involving the Committee in discussions with Goldman and ultimately arranging for the Committee to take over the representation of the estate in matters involving Goldman.

On September 26, 2001, the Debtors filed a motion to authorize the Committee to investigate and prosecute any further actions the estate may have against Goldman ("the Committee Authorization Motion"). In that Motion, MNAT disclosed that it represented Goldman in an unrelated matter. When no objections were filed, the Court granted the Committee Authorization Motion by order dated October 12, 2001.

Thereafter, the Committee asserted preference and fraudulent conveyance claims against Goldman with respect to the remaining $500,000 of the success fee. The parties have reached a settlement of that motion which would require Goldman to pay an additional $200,000 to the estate. Alber objected to that settlement asserting that it is tainted by conflicts of interest. The Court took the Goldman settlement motion under advisement with these matters.[4]

Alber argues that MNAT's representation of the Goldman Affiliates during the pendency of the Debtors' case, while at the same time it represented Goldman in the *Finova* case, created a conflict of interest which is impermissible under section 327(a) of the Bankruptcy Code. He argues that MNAT intentionally failed to disclose

its representation of the Goldman Affiliates at the outset of the case and that the subsequent disclosure was inadequate.

### i. *Disclosure*

MNAT argues that the disclosure requirements do not go so far as to require the disclosure of all connections it has with all parties in interest in the case. Such a rule would be so onerous as to create an impossible task, particularly in large corporate cases. *See, e.g., In re Enron Corp.,* No. 01–16034, 2002 WL 32034346, at *5 (Bankr.S.D.N.Y. May 23, 2002), *aff'd,* 2003 WL 223455 (S.D.N.Y. Feb.3, 2003) (holding that argument that counsel should be disqualified for "a failure to disclose—not connections as required under 2014—but a failure to disclose every conceivable interpretation of its connections and possible consequence resulting from the connections.... would make disclosure under Rule 2014 an impossible task subject to endless litigation over what would be enough.").

While the disclosure requirements "may not be so onerous as to require the party to raise with the court every imaginable conflict which may occur in a bankruptcy, it certainly compels disclosure where, as here, the party had contemplated and discussed a specific situation involving a potentiality for conflict." *In re BH & P, Inc.,* 119 B.R. 35, 44 (D.N.J.1990), *aff'd* 949 F.2d 1300 (3d Cir.1991). In this case, there was an actual conflict beginning in May 2001, when MNAT learned that the Debtors had a claim against Goldman. Disclosure at that time was mandated.

### ii. *Conflict of interest*

MNAT argues nonetheless that its representation of the Debtors was at

---

4. As noted hereafter, the Committee (and now the PEDC) is also pursuing a suit in District Court in New York against Goldman related

to the Debtors' initial public offering. That action is not affected by the settlement before this Court.

all times consistent with the requirements of section 327(a) of the Bankruptcy Code because it did not hold any "adverse interest" with respect to the Debtors and remained "disinterested" during the engagement. This is incorrect. While MNAT did not hold an interest adverse to the estate, it represented one.

MNAT suggests, however, that Goldman did not really have an interest adverse to the Debtors because it was clear that the success fee had to be returned by Goldman. That is belied by the fact that Goldman did not immediately return the funds and it took several months to obtain even the $2.5 million. The final settlement of this dispute was filed in December 2004, more than three years later. The suggestion that there was no real adverse interest between the Debtors and Goldman is quite simply wrong. Therefore, instead of representing the Debtors in any matter involving Goldman, MNAT should have promptly filed a supplemental affidavit with the Court disclosing its connection with Goldman and let another, disinterested professional handle the matter.

MNAT contends that its representation of Goldman in the *Finova* case was not a conflict because it was unrelated to this case, was limited to acting as Delaware counsel, and only accounted for 0.24% of the firm's total billings from 2000 to 2004. In support of its argument, MNAT cites *In re Muma Servs., Inc.*, 286 B.R. 583, 591 (Bankr.D.Del.2002). In the *Muma* case, the Court held that the limited representation of a client in another bankruptcy case did not disqualify the firm from representing the committee in a suit against the former client.

The *Muma* case is distinguishable from the instant case. First, the *Muma* case dealt with committee counsel, not debtor's counsel.[5] Second, in *Muma*, committee counsel did not continue to represent the other client (in fact the responsible attorney left the firm saying he was taking the client). Third, the Court found that the client had waived any conflict by not objecting to the firm's retention by the committee for more than a year.

In this case, MNAT continued to represent Goldman in the *Finova* case. Further, Goldman did not waive any conflict as is evidenced by the fact that MNAT admitted in the Committee Authorization Motion that there was a conflict and that it was not able to represent the Debtors in any action against Goldman.

Because MNAT had an actual conflict of interest it was not qualified to represent the Debtors in asserting their claims against Goldman. *See, e.g., In re Fleming Cos.*, 305 B.R. 389, 393 (Bankr.D.Del.2004) ("[S]ection 327(a) imposes a per se disqualification on any professional who has an actual conflict of interest.") citing *In re Pillowtex, Inc.*, 304 F.3d 246, 251 (3d Cir. 2002).

### iii. *Timing of Disclosure*

 MNAT asserts that it could not have disclosed its representation of the Goldman affiliates in the *Finova* case when the retention application was filed because it did not know at that time of Goldman's involvement in this case.

Assuming arguendo that MNAT did not know at the outset of this case that Goldman was involved, it nonetheless became

---

**5.** Committee counsel, retained under section 1103, need only show it does not represent an interest adverse to the estate; in fact, committee counsel is specifically authorized to represent a creditor in the case so long as its interests are not adverse to the committee's. 11 U.S.C. § 1103(b). In contrast, debtor's counsel, retained under section 327, must establish that it is disinterested, which is a higher standard. 11 U.S.C. § 101(14)(E).

aware of Goldman's involvement in May 2001, when MNAT learned that the Debtors had the right to recover the success fee from Goldman. At that time, MNAT was obligated to file a supplemental affidavit of disinterestedness, disclosing its connection with Goldman. *See, e.g., Rome*, 19 F.3d at 59 ("as soon as counsel acquires even constructive knowledge reasonably suggesting an actual or potential conflict . . . a bankruptcy court ruling should be obtained."). It failed to do so.

▮ MNAT asserts, however, that it did disclose the connection with Goldman by filing the Committee Authorization Motion when the firm learned of circumstances that necessitated the additional disclosure. The Court finds that is not sufficient. The Committee Authorization Motion was filed four months *after* MNAT knew there was a conflict, during which time MNAT continued to represent the Debtors on the matter. Further, the disclosures should have been made in a supplemental declaration filed under Bankruptcy Rule 2014(a). "It is not sufficient that the information might be mined from petitions, schedules, section 341 meeting testimony, or other sources." *B.E.S. Concrete*, 93 B.R. at 236.

### iv. *Harm to the estate*

MNAT contends nonetheless that . no sanctions are warranted because there was no harm to the estate. MNAT was successful in collecting part of the success fee from Goldman and no release of any other claims was given to Goldman. MNAT also asserts that the Committee was kept informed of the issue and that, therefore, when the Committee had to take over the representation, there was no delay.

▮ The Court rejects MNAT's arguments. Harm to the estate is not necessary to a decision to order disgorgement of fees where there is a conflict of interest.

*See, e.g., Leslie Fay*, 175 B.R. at 531 (holding that failure to disclose representation of parties who were materially adverse to the debtors mandated disallowance of fees awarded to counsel for debtors even though counsel "caused the debtors no actual injury, and represented them in an exemplary fashion.").

The Court notes, further, that MNAT's actions did result in harm to the estate because of the duplication of effort during the summer of 2001 caused by MNAT's continued work on the Goldman matter while keeping the Committee advised at every turn. If MNAT had simply withdrawn, the Committee counsel alone would have been billing the estate for this work.

### v. *Remedy*

▮ Because the case is now over, disqualification of MNAT as counsel to the Debtors is not practical. Although the Court could order disgorgement of all fees earned by MNAT after it ceased being disinterested, the Court finds that is unwarranted because MNAT did ultimately recuse itself from Goldman matters in September, 2001. Therefore, after that time it was not laboring under a conflict of interest. Because it had an actual conflict for several months (which it failed to timely disclose), the Court concludes that MNAT should disgorge all fees received in this case for work done by it on matters involving Goldman. 11 U.S.C. § 328(c) ("the court may deny allowance of compensation . . . if, at any time during such professional person's employment under section 327 . . . such professional person is not a disinterested person, or represents or holds an interest adverse to the interest of the estate with respect to the matter on which such professional person is employed."). *See also, In re Granite Partners, L.P.*, 219 B.R. 22, 40–41 (Bankr.S.D.N.Y.1998) (holding that court has discretion under section

328(c) to deny fees to counsel where a conflict of interest is found); *B.E.S. Concrete*, 93 B.R. at 237 (holding that court has discretion to deny fees for failure to disclose).

### b. *GECC*

■ With respect to GECC, MNAT admits that it did not disclose the connection. It asserts, however, that it failed to disclose the relationship because it was not aware that GECC was a creditor. GECC was not listed as a creditor on the Debtors' schedules or matrix because it apparently had received an assignment of another creditor's position. Therefore, MNAT asserts that it had no reason to disclose any connection at the time it filed its retention application.

MNAT did, however, become aware of GECC's involvement when GECC filed a notice of appearance in the case on June 4, 2001, and a motion to compel the assumption or rejection of its lease with the Debtors on June 20, 2001. Notwithstanding that notice, MNAT admits that it did not file any additional disclosure.

Instead, MNAT continued to represent the Debtors in connection with matters involving GECC. Those matters apparently included discussions with GECC which resulted in its withdrawal of the motion to compel and the Debtors' agreement to surrender the equipment to GECC. MNAT also represented the Debtors in connection with GECC's administrative claim of $72,909.87. The Debtors, represented by MNAT, objected to that claim, which was ultimately settled for $57,767.89. At no time did MNAT disclose (to the Court, creditors and perhaps even the Debtors)

its concurrent representation of GECC in the *Finova* case.

Because MNAT was representing GECC in another case at the same time, its representation of the Debtors against GECC in this case constituted an actual conflict of interest, in the absence of a conflict waiver executed by the parties after full disclosure. *See, e.g., B.E.S. Concrete*, 93 B.R. at 235 ("Although the parties can waive the conflict upon appropriate disclosures, the waiver is more difficult to obtain in a chapter 11 case because the debtor in possession stands in a fiduciary capacity that constrains its ability to make such a waiver.")

■ MNAT asserts that its failure to conduct an additional conflicts search and to make a supplemental disclosure of the GECC relationship was "an inadvertent oversight." That does not excuse the failure. *See, e.g., BH & P*, 949 F.2d at 1318 (finding that failure to disclose may result in disallowance of fees or disqualification, even if the failure was negligent and not willful); *In re Jore Corp.*, 298 B.R. 703, 729 (Bankr.D.Mont.2003) (same).

■ Because there was an actual conflict and no disclosure was made, the Court will require MNAT to disgorge the fees the firm has received for work done on behalf of the Debtors in the matters involving GECC. *See, e.g., In re Kaiser Group Int'l, Inc.*, 272 B.R. 846, 850 (Bankr. D.Del.2002) (concluding that court has inherent power to supervise attorneys who appear before it).

### C. *Traub, Bonaquist, Fox LLP*

#### 1. *Alber Motion*

Although his pleadings are replete with hyperbole [6] and assertions that were re-

---

**6.** An example is Alber's joinder to the UST Motion for disgorgement of fees by TBF:

44. While I, ALBER, sympathize with the far reaching implications to the system (and cases as a whole throughout) of the

vealed to be false when tested at trial,[7] the crux of Alber's Motion against TBF has some merit: it asserts that there is reason to disqualify TBF as counsel to the PEDC and to require disgorgement of all fees earned while TBF was counsel to the Committee because of TBF's failure at any time to disclose its relationship with Gold.

The relationship between Gold and TBF extends over many years and involves several bankruptcy cases where they were retained by the same or adverse parties. Alber refers to that relationship as "incestuous." The Court, however, differs. It is not unusual for professionals and turnaround specialists to work on the same cases. In fact, given the specialized nature of the bankruptcy practice, it is inevitable.

There is, however, one aspect of the parties' relationship that is unusual. In late 2000 or early 2001, Paul Traub, a partner in TBF, discussed with Gold the possibility of a joint venture for marketing inventory control and asset disposition services to distressed companies. Traub and Gold formed a limited liability corporation called ADA; Gold and Traub are the sole, and equal, members in ADA. Although ADA was not incorporated until April 26, 2001, Gold was compensated by ADA at the rate of $30,000 per month beginning in February 2001. Because ADA had not been formed and had no assets at that time, the compensation was actually paid by TBF. Gold and Traub testified that the funds were lent by TBF to ADA and were ultimately repaid by ADA from revenues ADA earned.

Despite being members of ADA, Gold and Traub are not required to work full time for ADA and may (and do) obtain work individually. Any work done by Gold and Traub individually is not required to be shared with the other or with ADA. ADA has no offices of its own, but conducts its business from the offices of TBF. Traub testified that ADA maintains its own books and records, separate from TBF. TBF does provide administrative services for ADA which ADA reimburses, from time to time. ADA has also used TBF personnel as non-legal consultants on its cases and has paid TBF, from time to time, for those services.

In addition to the ADA relationship, in early 2001 TBF retained Gold as a consultant in connection with the OfficeMax, Inc., and Drug Emporium, Inc., cases. It is unclear when that relationship ended.

At the same time that ADA was being formed, TBF was retained (in January, 2001) by an informal committee of creditors of the Debtors. When the Debtors ultimately filed their chapter 11 petitions, TBF was retained by the Committee.

---

blatant scheming that I, ALBER, feel is overwhelming proved positive by the blatant audacious disregard for the system as a whole such as the language of the hiring letter, by the vastly experienced attorney professionals of the TB & F, MNAT members in bankruptcy as legal extensive experienced professionals having filed many disclosure, fee applications, oaths etc. where even TB & F, ADA disclosed their relationship by the ADA letter in the Homelife case which ran basically almost concurrent with the eToys ESTATE and TB & F complied in part with 11 U.S.C. § 327 and Rule 2014

in Homelife and certainly was preconfirmation to the eToys PLAN of 2002, along with the admittance on March 1, 2005 of the payments by TB & F to GOLD in 2001, along with the subsequent admittance that reimbursement of the $120,000 was paid by ADA back to TB & F, creating a triangle of affiliations, along with TB & F admittance that it made a conscious decision not to disclose even after the issue came to public light in the Bonus Sales [sic] case....

7. *See* Discussion at Part E, *infra*.

Shortly thereafter, it became clear that the Debtors' senior management would not remain with the companies beyond May, 2001. The Debtors considered candidates for a restructuring executive from the Committee's and the Debtors' financial advisors. TBF, at the suggestion of Traub, recommended Gold for the position. After conducting interviews, the Debtors hired Gold on June 11, 2001, as wind-down coordinator and, after obtaining insurance, as their president and chief executive officer.

In addition, Alber asserts that TBF has failed to disclose its relationship with Fleet Retail Finance, an affiliate of FleetBoston. That failure to disclose is significant, Alber asserts, because the PEDC is pursuing litigation against Goldman and FleetBoston Financial arising from the Debtors' initial public offering. TBF was one of the firms representing the PEDC in that case.[8]

At no time did Gold or TBF reveal any of these relationships. Alber asserts that TBF's failure to disclose these relationships violates the disclosure requirements of Rule 2014 and constitutes a conflict of interest warranting disgorgement of all fees earned in the case. He also asserts that the failure to disclose constitutes perjury and obstruction of justice mandating a referral of this case to the U.S. Attorney.

### a. *Failure to Disclose*

TBF admits that it did not disclose the relationship with ADA. At the time of their retention, TBF notes that there was no connection with ADA to be disclosed. Further, even after the Debtor hired Gold, TBF asserts that no disclosure was mandated, because TBF has no relationship with ADA and ADA is not involved in this case. ADA is an entity in which Traub, not TBF, has an interest. TBF asserts it

is not a member of and never obtained any income from ADA. Further, the Debtors retained Gold, not ADA. Therefore, TBF asserts the "connection" between this case and ADA is remote.

TBF did have a direct relationship with Gold, however, having hired him as a consultant on several of its cases. TBF does admit, in hindsight, that it should have disclosed its relationship with Gold when the potential employment of Gold by the Debtors arose. It contends that its failure to do so was a mistake and not intentional wrongdoing. It argues that if it had intended to keep its relationship secret, it would not have disclosed it in the many cases in which ADA and TBF were involved. *See, e.g., Bonus Stores,* No. 03–12284; *In re Homelife Corp.,* No. 01–2412.

■■■ The duty of professionals to disclose is an ongoing one. Fed. R. Bankr.P. 2014(a); L.R.2014–1(a). The Court and parties in interest rely on the duty to disclose to help them monitor potential and actual conflicts. Thus, the duty to disclose is broader than the disclosure of actual conflicts, it mandates the disclosure of all connections a professional may have with the other parties in the case.

> All facts that may have any bearing on the disinterestedness of a professional must be disclosed. Consistent with the duty placed on the professional, it is the responsibility of the professional, not of the court, to make sure that all relevant connections have been brought to light. . . . So important is the duty of disclosure that the failure to disclose relevant connections is an independent basis for the disallowance of fees or even disqualification.

---

**8.** As a result of the Alber Motion, TBF has withdrawn as counsel in the IPO litigation and the PEDC is represented by others in that suit.

*Leslie Fay,* 175 B.R. at 533. *See also, BH & P,* 949 F.2d at 1317–18 (noting that professional may not leave court to search the record for undisclosed relationships); *Jore,* 298 B.R. at 725–26 (holding that professional must disclose all connections; he may not pick and choose which to disclose and which to ignore as unimportant).

■■■■ Failure to disclose may result in disallowance of fees or disqualification, even if the failure was negligent and not willful. *See, e.g., BH & P,* 949 F.2d at 1318; *Jore,* 298 B.R. at 729. Where the failure to disclose is willful, disallowance of fees is almost assured. *In re Crivello,* 134 F.3d 831, 836–37 (7th Cir.1998) (stating that "a bankruptcy court should punish a willful failure to disclose the connections required by Fed. R. Bankr.P.2014 as severely as an attempt to put forth a fraud on the court."). *Accord In re ACandS, Inc.,* 297 B.R. 395, 405 (Bankr.D.Del.2003) (disallowing nunc pro tunc retention and ordering disgorgement of all fees of professional which willfully concealed relationships and potential and actual conflicts).

### b. *Disqualification*

■■■ TBF asserts that there is no basis under the Code for its disqualification as counsel to the Committee on the facts of this case. It notes preliminarily that section 327(a) is not applicable because it was counsel to the Committee not counsel to the Debtors. 11 U.S.C. § 327(a). Instead, it asserts that the proper standard for retention of counsel for a committee is section 1103 which provides:

> An attorney ... employed to represent a committee under section 1102 of this title may not, while employed by such committee, represent any other entity having an adverse interest in connection with the case. Representation of one or more creditors of the same class as represented by the committee shall not per

se constitute the representation of an adverse interest.

11 U.S.C. § 1103(b). This provision is different from section 327(a) because (unlike counsel for the debtor) it does not require that counsel to a committee be disinterested.

Section 1103(b) does, however, require that counsel for the committee not hold or represent an adverse interest in connection with the case. An adverse interest is "any economic interest that would tend to lessen the value of the bankruptcy estate or that would create either an actual or potential dispute in which the estate is a rival claimant." *TWI Int'l,* 162 B.R. at 675; *National Liquidators,* 182 B.R. at 192.

TBF asserts that there is no evidence of any actual or potential conflict between its representation of the Committee and the Debtors' hiring of Gold. It argues that Gold's employment by the Debtors was completely unrelated to his work for ADA (or TBF). ADA had no involvement with this case, and, even if it did, TBF had no interest in ADA. No one at TBF, other than Traub, had an interest in ADA. While the relationships may raise an appearance of a conflict, they are not actual conflicts and disqualification is not warranted. *See, e.g., In re Marvel Entm't Group Inc.,* 140 F.3d 463, 476 (3d Cir.1998) (holding that disqualification cannot be premised on the mere appearance of conflict alone though court has discretion to disqualify counsel with a potential conflict and must disqualify counsel with an actual conflict).

### 2. *UST Motion and Settlement*

The UST Disgorgement Motion was based, like Alber's, on TBF's failure to disclose the relationship TBF and Traub had with Gold. Even if, as TBF asserts, the relationship did not constitute a conflict or adverse interest, the UST asserted

that it had to be disclosed. *Cf., In re CF Holding Corp.,* 164 B.R. 799, 806–07 (Bankr.D.Conn.1994) (holding that debtor's counsel should be sanctioned, by a reduction in fees awarded, for failure to disclose another professional's conflict of interest).

Shortly after filing the Disgorgement Motion, the UST settled that dispute. Under the settlement, TBF agreed to disgorge $750,000 of the fees received by it in this case. That amount represents approximately 50% of the total post-petition, pre-confirmation fees earned by TBF.

 Settlements are favored as a means of minimizing litigation, expediting administration of estates, and providing for the efficient resolution of bankruptcy cases. *In re Martin,* 91 F.3d 389, 393 (3d Cir.1996). To approve a settlement, the Court must consider four criteria: "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors." *Id.* Because the Disgorgement Motion is a sanctions motion, the Court should also consider the deterrent value that approval of the Settlement would have. *Pearson,* 200 F.3d at 42 & n. 7, quoting *John's Insulation, Inc. v. L. Addison & Assoc., Inc.,* 156 F.3d 101, 110 (1st Cir.1998) ("The purpose of sanctions, moreover, is not merely to penalize violations of court procedures, but also to deter future violations by other parties, and thus sanctions do not have to be strictly proportional to the severity of a given party's violations.").

 Consideration of all these factors convinces the Court that approval of the Settlement is appropriate in this case. There is a strong probability that the UST will succeed in part on its Disgorgement Motion. TBF has admitted its failure to disclose its relationship with Gold. As discussed above, TBF vehemently disputes that the relationship with Gold ever constituted an actual conflict. Therefore, the Court concludes that there is a risk to both sides if this issue is litigated.

There is no suggestion that there will be any difficulty in collecting any judgment which the UST may obtain on its Disgorgement Motion. TBF is an established bankruptcy firm. It is aware that its failure to obey a court order of disgorgement in a bankruptcy case would have serious effects on its ability to practice in this Court or any other Bankruptcy Court in the future.

While the litigation is complex, the settlement will not save any expenses because Alber's Motion is virtually identical to the Disgorgement Motion. Discovery has been conducted and a full hearing has been held on Alber's Motion. Therefore, no savings are attendant to approval of the Settlement.

The paramount interests of creditors are served by approval of the Settlement, because the Court finds that it is a reasonable penalty for the transgression committed by TBF.

The Settlement also furthers the deterrent goal of a sanctions motion. The Court is convinced that the ordeal of defending the Alber Motion, coupled with the significant repayment of fees earned, will cause TBF to assiduously follow the disclosure requirements of the Code and Rules in the future. The settlement also serves as a "lighthouse" to others warning them to avoid the "rocks" of non-disclosure.

Consequently, the Court will grant the UST Motion for approval of the Settlement with TBF and will deny the Alber Motion to the extent it seeks to impose any additional penalty on TBF.

### D. *Barry Gold*

Alber also alleges that Gold should be disqualified and ordered to disgorge all fees received in this case because of his undisclosed relationship with TBF, ADA and Traub. Alber asserts that Gold: (1) had numerous conflicts of interest; (2) breached his duty of loyalty to the Debtors; (3) violated section 327(a) and Bankruptcy Rule 2014; (4) committed perjury and other bankruptcy crimes; and (5) wasted estate assets. Gold denies all of the allegations.

#### 1. *Conflicts of Interest*

 Alber alleges that Gold had numerous conflicts of interest which should have prevented him from serving as the Debtors' CEO and president. Alber asserts that the relationships among TBF, Traub, Gold and ADA constituted an actual conflict of interest that had to be disclosed and would have disqualified Gold from being retained by the Debtors.

Gold acknowledged that he has a relationship with counsel for the Committee but denies that it was a disabling conflict of interest. Gold argues specifically that his relationships with ADA, TBF and Traub did not create a conflict of interest. He was hired by the Debtors in this case, ADA was not. Therefore, Gold asserts that there was no conflict to be disclosed.

Gold seeks to distinguish this case from the *Coram* case. *In re Coram Healthcare Corp.*, 271 B.R. 228, 236 (Bankr.D.Del. 2001). In *Coram*, the debtor's CEO had a written consulting agreement with one of the largest creditors by which he was paid $1 million in consulting fees. Though the CEO insisted that the relationship was unrelated to the bankruptcy case, there was little evidence of what the CEO did to earn the fee, other than his work for the debtor. Further, there was significant evidence that the CEO caused the debtor to take actions favorable to the creditor that were not in the best interest of the debtor.[9]

The Court agrees that this case is distinguishable from the *Coram* case. The business relationship between Gold and Traub involved the split of profits from ADA. ADA earned its fees from work performed by Gold and/or Traub when it was retained in bankruptcy cases. Therefore, unlike the contract in *Coram*, Gold was not receiving compensation from Traub simply for "consulting" with him or otherwise doing his bidding. Gold earned compensation from ADA for work performed by ADA.

Further, Gold's business relationship is with a professional in the case, not with a creditor. ADA and Traub have no direct claim against the Debtors in this case and, therefore, there is less possibility that they will pressure Gold to promote their personal interests over the interests of other creditors in the case. In addition, TBF is acting as counsel for the Committee and has a fiduciary duty to all creditors. This is significantly different from acting as counsel for one individual creditor or group of creditors.

Furthermore, the instant case is a liquidation case where the interest of the Debtors and the creditors is the same: to realize the maximum recovery from the Debtors' assets. In contrast, *Coram* was a reorganization case where the creditors and shareholders disagreed over the enterprise value and, therefore, what recovery shareholders should receive.

---

9. An example is the payment of interest in cash to the noteholders immediately before the bankruptcy filing when the debtor was contractually required only to pay in kind by the issuance of new notes.

The parties did, however, acknowledge that Gold was working as a consultant to TBF on two cases at the time he was hired by the Debtors. That relationship, together with the fact that Gold was being paid $30,000 per month by TBF (albeit on behalf of ADA), does create at a minimum a potential conflict of interest. Given Gold's extensive business relationship with TBF, his loyalty to the Debtors could be questioned.

### 2. *Breach of Loyalty*

Alber asserts that Gold's relationship with Traub (and failure to disclose that relationship) constituted a breach of Gold's duty of loyalty to the Debtors. Gold denies that he had any disqualifying conflict of interest which he was required to disclose.

Under Delaware law "[c]orporate officers and directors are not permitted to use their position of trust and confidence to further their private interests.... and stand in a fiduciary relation to the corporation and its stockholders." *Guth v. Loft, Inc.,* 5 A.2d 503, 510 (Del. 1939). The duty of loyalty "requires an undivided and unselfish loyalty to the corporation [and] demands that there shall be no conflict between duty and self-interest." *Id.*

In the instant case, there was a potential conflict between Gold's position as president and CEO of the Debtors and his business relationships with counsel for the Committee. "When faced with such divided loyalties, directors [and officers] have the burden of establishing the entire fairness of the transaction to survive careful scrutiny by the courts." *Mills Acquisition Co. v. Macmillan, Inc.,* 559 A.2d 1261, 1280 (Del.1989). The duty of loyalty is usually tested in cases where an officer or director has an interest in a party involved in a sale transaction with his company. In that context, courts focus on "fair dealing and fair price" in determining the entire fairness of the transaction. *Id.*

In this case, there was no transaction between the Debtors and ADA. Therefore, the Court need not determine if the dealings between the two were fair and for a fair price. Gold's position as a partner at ADA did not constitute a breach of his duty of loyalty to the Debtors under Delaware law. Nor is there any other evidence that Gold's other relationships with TBF and Traub caused him to violate his duty of loyalty to the Debtors. Consequently, the Court concludes that no breach has been established.

### 3. *Section 327 and Bankruptcy Rule 2014*

Alber asserts that, because of his conflict of interest, Gold also violated section 327 and Bankruptcy Rule 2014 by failing to disclose his relationships with TBF, Traub and ADA at the time he was hired by the Debtors.

Gold argues that he is not required to comply with section 327(a) or Bankruptcy Rule 2014 because he was hired as an employee of the Debtor and is not a professional as that term is used in section 327(a). *See, e.g., In re All Seasons Indus., Inc.,* 121 B.R. 822, 825 (Bankr.N.D.Ind. 1990) (concluding that section 327(a) could not apply to officers, because it would result in wholesale removal of all pre-petition officers who are insiders and not disinterested); *In re Phoenix Steel Corp.,* 110 B.R. 141, 142 (Bankr.D.Del.1989) (holding that officers employed by debtor pre-petition could continue to be employed postpetition under section 327(b) without court approval); *In re Midland Capital Corp.,* 82 B.R. 233, 239 n. 10 (Bankr.S.D.N.Y. 1988) ("Executive officers are simply not 'professional persons'."). *See generally,*

*Collier on Bankruptcy* § 327.02[6][c] (15th ed. rev.) (stating that the correct analysis is that executives of the debtor are not professionals whose employment is subject to approval under section 327(a)).

Alber asserts, however, that Gold should have known that his relationship with ADA and Traub was inappropriate and should be disclosed because of his experience in the *Bonus Stores* case. That case, however, is distinguishable.

In *Bonus Stores,* the Debtor sought to retain both TBF and ADA (not Gold) as professionals under section 327(a). The Court denied the ADA application and permitted retention of TBF as special counsel only. That denial was not predicated on the relationship among TBF, Traub, Gold and ADA.[10] Instead, it was because ADA and TBF had performed pre-petition services for the debtor's secured creditor in connection with the debtor. The Court found that their representation of a creditor in matters relating to the debtor was a direct conflict of interest precluding their retention by the debtor under section 327(a).

In this case, ADA was not retained by the Debtors; Gold was. In addition, there is no evidence in this case that Gold ever represented any creditor of the Debtors in dealings with the Debtors. Thus, the facts of this case are distinguishable from *Bonus Stores.*

There are courts, however, which have held that the retention and/or the compensation of the debtor's executives must be approved by the bankruptcy court. *See, e.g., In re The Crouse Group, Inc.,* 75 B.R. 553 (Bankr.E.D.Pa.1987) (holding that, although compensation of debtor's officers is subject to court scrutiny, disqualification under section 327 is not automatic because of lack of disinterestedness); *In re Zerodec Mega Corp.,* 39 B.R. 932, 935 (Bankr. E.D.Pa.1984) (holding that employment of officers and their compensation are subject to bankruptcy court approval because "the statutory framework established by §§ 327 and 328 provides an express treatment of the subject of employment [of officers] with the requisite safeguards and restrictions.") and cases cited therein. *See generally,* 5 *Collier on Bankruptcy* § 1107.03 (15th ed.1983) (stating that section 1107 permits employment of officers under section 327(a) even though they had been employed by the debtor pre-petition).

Even the courts which hold that section 327(a) does not apply conclude that they have authority to review the compensation paid to officers for reasonableness. *See, e.g., Phoenix Steel,* 110 B.R. at 142–43 (holding that compensation of debtor's officers is subject to section 330 review by court); *Midland Capital,* 82 B.R. at 238 (concluding that compensation of officers is subject to review for reasonableness under section 503(b)(1)(A)).

The Court agrees with those courts that conclude that an officer is not a professional who needs to be retained by the debtor under section 327(a). Nonetheless, the Court does have the power to supervise and deny compensation to officers of a debtor in appropriate circumstances. The extent of relationships that might affect an officer's loyalty (and the failure to disclose those relationships) are factors that the Court should consider in supervising officers of the debtor. In order to properly exercise such a role, as well as to permit other parties in interest to evaluate the officer, the disclosure of relationships that an officer may have with

---

**10.** There could have been an issue of improper fee-sharing in that case had both ADA and TBF been retained. *See* 11 U.S.C. § 504(a).

Because ADA was not retained, the issue was moot.

creditors, professionals, and other parties in interest in the case is necessary. If officers do not have to disclose conflicts of interest, the Court would not be able to evaluate the reasonableness of the compensation being paid to the officer or prevent improper conduct. The facts of this case, as well as others, convince the Court that without a disclosure requirement much mischief can occur. *Coram*, 271 B.R. at 236.

■ In this case, Gold acknowledges that he failed to disclose to the Debtors, their counsel or any other party his relationship with TBF, Traub and ADA at the time he was hired by the Debtors. Unlike TBF and MNAT, as an officer of the Debtors Gold was not required at the time to disclose that relationship. In the future, however, the failure of an officer of a debtor to disclose such relationships will subject that officer to review and possible disgorgement of compensation if the Court concludes that the relationship constitutes an actual conflict of interest.

■ In this case, the Court concludes, upon review of the relationships among Gold, TBF, Traub and ADA, that the evidence fails to establish any actual conflict of interest held by Gold that caused any harm to the estate. Therefore, the Court concludes that there is no basis to reduce Gold's compensation or otherwise sanction him under the general equitable concepts of the Bankruptcy Code.

#### 4. *Perjury and Bankruptcy Crimes*

Alber asserts that Gold committed perjury and other bankruptcy crimes. Among the other "crimes" Alber asserts Gold committed are obstruction of justice, bankruptcy fraud, concealment of assets, false oaths and claims, and bribery. Absolutely no evidence of any of these purported crimes was, however, adduced at trial.

The essence of Alber's allegations is that Gold failed to disclose his relationship with ADA, Traub, and TBF in his retention application and in the biography he submitted in connection with his retention as Plan Administrator. As noted above, no rule existed at that time requiring an officer of the debtor to disclose any relationship in a case. Therefore, the failure to disclose cannot be considered perjury or any other bankruptcy crime. Consequently, the Court finds no reason to refer this matter to the U.S. Attorney.

#### 5. *Waste of Estate Assets*

■ Alber asserts that Gold wasted assets of the estate by preparing a form 10k which the Debtors never filed with the SEC. Gold testified that work was done on the 10k because the SEC denied the Debtors' request for exemption. Ultimately, however, the 10k was never filed because it was determined after consultation with counsel that the SEC filing requirements could be satisfied by filing the Debtors' monthly operating reports under an 8k rather than finishing the costly task of filing the 10k. Gold testified that the work on the 10k was used in other filings and was not a waste.

The Court does not fault Gold for having taken the precaution of doing preliminary work on the 10k until it could be clarified whether the filing would be required. Further, Gold was on salary so there was no additional expenditure by the estate for that work. Nor is there any suggestion that Gold failed to perform other necessary tasks because of it. In fact, Gold points to the efforts he has expended in this case which has resulted in a 16% recovery for general unsecured creditors, when it was originally estimated that they would receive only 10%. Gold asserts that his efforts in maximizing value for creditors belies any suggestion that he was

conflicted, failed to fulfill his fiduciary duties, or wasted assets of the estate. The Court agrees that Alber has failed to establish any basis for his allegation that estate assets have been wasted.

Alber does raise, in his post-trial submission,[11] that Gold has failed to adequately represent the interests of the estate by allowing the Debtors' corporate registration to lapse in May 2002. This was apparently occasioned by the resignation of the Debtors' agent, without notice to the Debtors.

■■■ Even if this occurred through negligence of the Debtors or Gold, however, the Court concludes that there has been no harm to the estate. The Debtors in this case are liquidating. Under Delaware law, a dissolved company "remains a viable entity authorized to possess property as well as sue and be sued incident to the winding up of its affairs." *City Investing Co. Liquidating Trust v. Continental Cas. Co.*, 624 A.2d 1191, 1195 (Del.1993). *See also* Del.Code Ann. tit. 8, § 278 (2004) (providing an automatic three year extension of corporate existence after dissolution, which may be extended for any purpose relating to litigation and the winding up of its affairs). Consequently, even if the Debtors had been dissolved under Delaware law they are authorized to continue to perform all things necessary to finish liquidating the estate and paying creditors. Thus, there is no basis to conclude that Gold has not performed appropriately in this case.

For the reasons stated above, the Court concludes that Gold had a potential conflict of interest that should have been disclosed at the time of his retention. Because there is no evidence that an actual conflict

of interest arose or that any harm occurred as a result of the potential conflict of interest, the Court concludes that no reduction in Gold's compensation is warranted. The Court further does not find that Gold committed any bankruptcy crime or wasted assets of the estate. Therefore, it will deny Alber's Motion as to Gold.

### E. *Goldman Settlement*

■■■ As noted above, the Committee has reached a settlement with Goldman by which Goldman will remit an additional $200,000 to settle the request for return of the success fee and expenses paid prepetition. Alber objects to the settlement asserting (1) that a member of the Committee had an actual conflict of interest at the time the Goldman settlement was approved and (2) that the estate has other claims against Goldman.

Despite Alber's allegations, the evidence presented at trial established that there was no conflict on interest. Alber asserted that one of the members of the Committee (and later the PEDC), R.R. Donnelly & Sons Co. ("Donnelly"), had two Goldman directors on its board of directors at the time the Committee approved the Goldman settlement. In fact, the affiliation was with GS Capital Partners, an entity which has no relationship or connection with Goldman. Further, Donnelly was not even a member of the PEDC at the time the Goldman settlement was approved. Donnelly left the Committee, not because of any conflict, but because the individuals serving on the PEDC for Donnelly left its employ.

Further, the Settlement with Goldman does not contain a general release. Therefore, approval of it will have no adverse effect on the action brought by the PEDC

---

**11.** This is one example of pleadings filed by Alber alleging wrongdoing without presenting any evidence of it at the hearing. The Court has entered Orders striking similar submissions.

against Goldman and others for damages resulting from the failed IPO.

There being no other objections and the Court being convinced that the Goldman settlement is in the best interest of the estate, it will approve the Goldman settlement.

## IV. *CONCLUSION*

For the reasons stated above, the Court will grant, in part, Alber's Motion to disqualify and for disgorgement of fees from MNAT and require the repayment of all fees earned for services rendered in connection with the Goldman and GECC matters. The Court will grant the UST's Motion for approval of the Settlement with TBF and will deny Alber's Motion for sanctions against TBF to the extent it seeks any further relief from TBF. The Court will deny Alber's motion for sanctions and other relief against Gold. Finally, the Court will approve the Goldman settlement.

An appropriate Order is attached.

### *ORDER*

AND NOW, this day of **OCTOBER, 2005**, upon consideration of the Motions filed by Robert Alber and Collateral Logistics, Inc., against Barry Gold, Morris Nichols, Arsht & Tunnell and Traub, Bonaquist, Fox LLP and certain of their partners seeking removal, disgorgement of fees, and sanctions and the Motion filed by the U.S. Trustee for approval of a Settlement resolving its Motion for disgorgement of fees against Traub, Bonaquist, Fox LLP, and the Motion for approval of a settlement agreement with Goldman Sachs & Co. and the various responses thereto, for the reasons set forth in the accompanying Opinion, it is hereby

**ORDERED** that the Motion of Collateral Logistics, Inc., is **DENIED**; and it is further

**ORDERED** that the Motions of Robert Alber are **GRANTED IN PART AND DENIED IN PART** as set forth herein; and it is further

**ORDERED** that Morris Nichols, Arsht & Tunnell **SHALL DISGORGE** all fees received by it for work performed in connection with any matter relating to GECC or Goldman Sachs & Co.; and it is further

**ORDERED** that the settlement between the U.S. Trustee and Traub, Bonaquist, Fox LLP is **APPROVED**; and it is further

**ORDERED** that the settlement with Goldman Sachs & Co. is **APPROVED**.